

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-27-2006

# Zou v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-4314

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Zou v. Atty Gen USA" (2006). *2006 Decisions*. Paper 413.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/413

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-4314

———————

ZHENLIN ZOU,
                    Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                    Respondent

———————

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS
Agency No. A97-159-832
Immigration Judge: Annie S. Garcy

———————

Submitted Under Third Circuit LAR 34.1(a)
September 12, 2006

———————

Before: SCIRICA, Chief Judge, SLOVITER and BARRY, Circuit Judges

———————

(Opinion Filed: September 27, 2006)

———————

OPINION

———————

BARRY, Circuit Judge

    Petitioner, Zhenlin Zou, a native and citizen of Changle City in the Fujian

Province of China, asks this Court to grant his petition for review of an order of the Board of Immigration Appeals ("BIA") affirming an Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). For the following reasons, we will grant the petition, vacate the BIA's order, and remand to the BIA.

## I.

Zou entered the United States on December 19, 2002 and was subsequently served by the former Immigration and Naturalization Service ("INS") with a Notice to Appear, which alleged that Zou was inadmissable as an immigrant not in possession of valid entry documents in violation of section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(7)(A)(i)(I). Zou filed an application for asylum, withholding of removal, and protection under CAT, and, at an August 1, 2003 hearing, conceded the charge brought by the INS while reasserting his various claims for relief.

A hearing on Zou's application was held on May 5, 2004 before the IJ. Zou testified that he married Lin Baofang on February 25, 1991, and that they had their first child, a daughter, on March 7, 1992. Shortly thereafter, the local family planning office "forcefully inserted" an intrauterine device ("IUD") into his wife, which the couple secretly removed at the Spring Festival in 1993. (A.R. 76–77.) Wanting to have more children, the family moved to Guangdong, where the couple's second child, also a daughter, was born on December 22, 1993. For a variety of reasons, the family returned

2

to Changle City in 1994, leaving their second daughter with relatives.

Baofang was subject to medical checkups in Changle City, and it was discovered that her IUD had been removed. Therefore, a second IUD was inserted in 1994 and the family was fined. Zou did not pay the fine, and, as a result, "[t]he government came to [his] home and removed some of the furniture and then destroyed some of the furnishings." (A.R. 106.) In 1996, Zou applied for a birth permit in order to have another child. That request was denied because, according to Zou, "somebody had reported to the authorities that [he] had already given birth to another daughter." (A.R. 95.)

At a September 12, 1997 check-up, it was discovered that Baofang was two months pregnant. She was detained for a period of eighteen days, during which time family planning officials discovered the second daughter at the relatives' home. Baofang was immediately brought to a hospital where the fetus was aborted and she was sterilized. Zou left China on December 18, 2002. His wife and two children remain there.

In addition to his testimony, Zou submitted a number of documents, including a letter from his wife, a report from an American doctor concluding that hysterosalpingogram films, purportedly of Baofang, are consistent with sterilization, and a "Certificate of Marriage and Birth of Floating Population," issued on April 14, 2003, which purports to certify that Baofang had a "Sterilization Operation on 9/30/97." (A.R. 376.)

Following the hearing, the IJ issued an oral decision denying Zou's applications

3

and ordering him removed. Citing a series of inconsistencies, the IJ concluded that his "testimony is not established as credible because it is simply not reliable, consistent, or, for that matter, sensible." (A.R. 47.) As such, having also discredited his documentary submissions, the IJ determined that "[Zou] fails to establish the truth of the basic facts in the case." (A.R. 48.) By order dated August 22, 2005, the BIA affirmed the IJ's decision without opinion.

## II.

In order to qualify for the discretionary relief of asylum, an asylum applicant bears the burden of establishing that he or she is a "refugee," as that term is defined in section 101(a)(42) of the INA, 8 U.S.C. § 1101(a)(42)(A). See 8 C.F.R. § 1208.13(a). A "refugee" is an alien "who is unable or unwilling to return to . . . [his or her] country [of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Congress has specified that "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization . . . shall be deemed to have been persecuted on account of political opinion," id. § 1101(a)(42)(B), and the BIA has determined that spouses of such persons shall be deemed to have suffered persecution as well. See Chen v. Ashcroft, 381 F.3d 221, 222 (3d Cir. 2004); In re C-Y-Z, 21 I. & N. Dec. 915, 917–18 (BIA 1997).

In order to be eligible for withholding of removal, an applicant must

"demonstrate[] a 'clear probability' that, upon return to his or her home country, his or her 'life or freedom would be threatened' on account of race, religion, nationality, membership in a particular social group, or political opinion." Chen v. Ashcroft, 376 F.3d 215, 223 (3d Cir. 2004). "An alien who fails to establish that he or she has a well-founded fear of persecution, so as to be eligible for a grant of asylum, necessarily will fail to establish the right to withholding of removal." Id.

To qualify for withholding of removal pursuant to the CAT, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." Id. § 208.18(a)(1).

Where, as here, the BIA affirms a decision of the IJ without opinion, we review the IJ's decision. Chen v. Gonzales, 434 F.3d 212, 216 (3d Cir. 2005). The IJ's findings of fact, which include adverse credibility determinations, are reviewed under the substantial evidence standard. Dia v. Ashcroft, 353 F.3d 228, 247–48 (3d Cir. 2003) (en banc). Under that standard, the Court examines the IJ's findings and asks whether they are "supported by evidence that a reasonable mind would find adequate." Id. at 249. "[I]f no reasonable fact finder could make that finding on the administrative record, the finding is not supported by substantial evidence." Id. An IJ's credibility determinations must be based on specific, cogent reasons, and not on speculation, conjecture, unsupported

5

personal opinions, id. at 250, or minor inconsistences that do not touch upon the " 'heart of the asylum claim,' " Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002) (quoting Ceballos-Castillo v. INS, 904 F.2d 519, 520 (9th Cir. 1990)).[1]  Where an IJ relies on "personal observations of [an applicant's] demeanor," the Court "must accord an even greater degree of deference" to the IJ's findings. Dia, 353 F.3d at 252 n.23.

## III.

Zou argues that the IJ's adverse credibility determination is not supported by substantial evidence because "the IJ's findings of alleged inconsistencies and/or omissions are either based on the IJ's misinterpretation of the record of proceedings, or where such inconsistencies appear to exist, they are not central to [Zou's] claim." Pet.'s Br. at 18.  We agree.

The IJ supported her adverse credibility determination with a litany of inconsistencies which she claimed "display[ed] [Zou's] tendency to mix up things and to forget things and scramble things, which has impeded the Court with regard to trying to figure out the exact case facts." (A.R. 39.)  A number of these "inconsistencies," we note, were clearly inadvertent misstatements about facts or issues that were not in dispute or

---

[1] Applications requesting asylum, withholding, or other relief from removal made after May 11, 2005 are subject to new standards regarding credibility determinations which allow the factfinder to consider inconsistencies, inaccuracies, and falsehoods in an applicant's statements without regard to whether they "go[] to the heart of the applicant's claim." REAL ID Act of 2005 § 101(a)(3), (c), (d), 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1231(b)(3)(C), 1229a(c)(4)(C).

did not go to the heart of Zou's claim. The IJ stated, for example, that Zou initially testified that his first daughter was born in 1997, and then "changed the date to 1992." (A.R. 39.) She also stated that Zou "claim[ed] that he left his nation December 18, 2000. Obviously, that's not so. He left in 2002." (A.R. 47.) Zou corrected both mistakes, and in neither was the date actually in dispute.

In addition to improperly over-emphasizing minor "inconsistencies," the IJ made much of an "inconsistency" which did not exist between Zou's testimony and his asylum application. According to the IJ,

> Why [Zou] moved back is inconsistently testified about by him today. First, he testified that he returned to his hometown because the brick factory that he worked at in Guangdong closed. Then suddenly, [Zou] began to create a version of the facts that was totally different, not contained in his asylum application or even in his wife's letter. . . . Suddenly, [Zou] testified that they moved back because letters were being written and notices were being delivered to family members, insisting that the couple return home or their house would be torn down. . . . In other words, the two versions of why they returned home are totally inconsistent.

(A.R. 40–41.) In fact, Zou's asylum application and his testimony both contain the same two reasons as to why the family returned home. The asylum application stated that "[w]e returned to hometown for the spring festival of 1994. Since the brick factory was sold out and the hometown family planning office had warned us the serious action would be taken if my wife continued to fail to report for the routine pregnancy and IUD check up." (A.R. 343.) Zou's testimony at his hearing was substantially similar. (A.R. 82–91.) The IJ's conclusion that "the Court simply cannot find as credible the fact that [Zou's]

7

wife would have voluntarily gone into medical examinations in 1994" is undermined by Zou's consistent position. (A.R. 49.)

The IJ's adverse credibility determination also rested on a number of conclusions that were speculative and personal opinions that are simply not supported by the record. For example, the IJ repeatedly concluded that Baofang's first IUD insert was "improperly characterized as involuntary." (A.R. 48.) Zou testified that his wife's "health was not that well" following the birth of his first daughter. (A.R. 79.) According to the IJ, this meant that Zou's wife "needed to have an IUD insert" (A.R. 48) because it "helped [her] delay the birth of the second child." (A.R. 79.) The IJ concluded that this "collaps[ed] [Zou's] testimony that the IUD was inserted into his wife against her will." (A.R. 48.) Although the IUD insert might have helped delay the birth of Zou's second child, the IJ's conclusion that the insertion was voluntary was mere conjecture.

Similarly speculative was the IJ's conclusion regarding the timing of Baofang's sterilization. Zou testified that he was afraid to obtain, while he was still in China, a "Certificate of Marriage and Birth and Floating Population." (A.R. 116.) That document, which indicates that Baofang underwent a "Sterilization Operation on 9/30/97," was not obtained by Baofang until April 14, 2003. Based on this, the IJ concluded that

> [T]he only thing I can think of that would frighten you away from going to ask for a floating population certificate sooner than April 2003 would be that you would have been afraid before you left China that you or your wife might be sterilized, leaving me in a position, I think, to conclude that your wife must have arranged her own sterilization after you left the country, when you learned it would help you to win asylum.

8

(A.R. 51, 65.)[2]

Stripped of its discussion of minor inconsistencies and its speculation, the IJ's decision offers little to support her conclusion that Zou was not credible. While she did cite Zou's demeanor as a factor which "defeated" his credibility, she gave no specific examples to bolster this conclusion, merely describing Zou as "getting tired, nervous, [or] discouraged," characteristics which do not inherently undermine one's veracity. (A.R. 47.)

Similarly unsupported was the IJ's ruling of implausibility. The IJ cites to the State Department's Country Report for the proposition that agricultural couples are generally allowed to have a second child when the first child is a daughter. Thus, according to the IJ, there is no reason why Zou and his wife "would have been subjected to sterilization" before they officially registered their second daughter in 1998. (A.R. 51–52.) This analysis misinterprets the record, because the alleged forced abortion and sterilization took place at a time when Baofang was pregnant with her prospective third child and family planning officials had definitively discovered the existence of her second

---

[2] The IJ was chastised by us for reaching the same speculative conclusion in a factually similar case. See Wang v. Att'y Gen. of the U.S., 423 F.3d 260, 265 (3d Cir. 2005). She was also reprimanded in that case for her hostile attitude towards the applicant. Although the record here does not reveal statements as unfortunate as those she made in Wang, the IJ on several occasions showed her displeasure with Zou's decision to leave his second daughter with relatives. The IJ asked, "Get rid of the girl, right?" and later observed that the whole situation was "so creepy" and that the family "basically ignor[ed]" the daughter's existence. (A.R. 50, 82, 84.)

daughter.

In sum, we find that the IJ's adverse credibility determination is not supported by substantial evidence. We do not decide whether Zou was credible or should be entitled to the relief that he seeks, as those are determinations to be made by the BIA on remand. See Cao v. Att'y Gen. of the U.S., 407 F.3d 146, 161 n.4 (3d Cir. 2005).

## IV.

In light of the foregoing, we will grant Zou's petition for review, vacate the BIA's order, and remand this matter to the BIA for further proceedings.