

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-21-2005

# Wang v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 04-2866

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Wang v. Atty Gen USA" (2005). *2005 Decisions.* Paper 464.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/464

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 04-2866
_____

QUN WANG,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

_____

On Petition for Review of an Order
of the Board of Immigration Appeals
(BIA No. A77-993-922)

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 8, 2005

BEFORE: FUENTES, VAN ANTWERPEN, and BECKER,
Circuit Judges

_____

(Opinion Filed:  September 21, 2005  )

_____

1

Dehai Zhang
Suite 207
39-15 Main Street
Flushing, NY 11354

ATTORNEY FOR PETITIONER

Jonathan Porter
Emily Radford
Allen Hausman
Blair T. O'Connor
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, DC 20044

ATTORNEY FOR RESPONDENT

_____

OPINION OF THE COURT
_____


FUENTES, Circuit Judge.

We have stressed previously that "[a]s judicial officers, [immigration judges] have a responsibility to function as neutral and impartial arbiters and must assiduously refrain from becoming advocates for either party." Abdulrahman v. Ashcroft, 330 F.3d 587, 596 (3d Cir. 2003). Here, we find the immigration judge (IJ) failed this basic requirement.

Petitioner Qun Wang alleges that his wife was forcibly sterilized after giving birth to a second child. The IJ found him incredible and denied him relief from deportation. The Board of Immigration Appeals (BIA) affirmed. Because of the manner in which the IJ conducted Wang's hearing, and the deficiencies in her opinion, we do not believe that the existing record can sustain an adverse credibility finding. Accordingly, we will grant the

petition.

# I.

## A. Events in China

Wang is a 34-year old native and citizen of the People's Republic of China. He alleges that an intrauterine device (IUD) was forcibly inserted into his wife by government officials after she gave birth to their first daughter in November 1998. Wang claims that because the daughter was born with a disability, and because he and his wife wanted a son, they asked the local authorities for permission to have a second child. Their request was denied pursuant to Fujian Province Family Planning Regulations, under which those with an agricultural registration, including Wang's wife, are not permitted to have more than one child. AR 253-55. Wang alleges that his wife had the IUD removed by a private doctor and she became pregnant again in December 1999. Wang's wife hid at her parents' house until she gave birth to a second daughter. Because she did not wish to burden her ill and aging parents, and because she did not desire to remain in hiding forever, Wang's wife returned home one month after the birth of her second daughter, in October 2000. Shortly thereafter, Wang alleges that a local birth control cadre came into their home and dragged his wife to a family planning center where she was involuntarily sterilized. Wang submitted into evidence the 1989 Fujian Province Family Planning Regulations that prescribe such measures. The officials also allegedly fined Wang 12,000 RMB (or "Renminbi"), and upon his refusal to pay, began deducting a penalty from Wang's parents' retirement pension.

Wang claims that, in the period between his wife's forced sterilization and his departure for the United States, he unsuccessfully attempted to procure a visa to the United States using false documents. He also allegedly wrote a letter to the United Nations Human Rights Commission describing the above incidents. He delivered that letter to the United States Consulate in Guangzhou but denied to consular officials that it related to himself out of fear that its contents might be communicated to Chinese authorities. Wang ultimately left China for the United States through a smuggler whom he paid approximately $60,000 in borrowed funds.

3

**B. Proceedings in the United States**

Wang arrived in the United States in January 2002 without valid entry documents. The former Immigration and Naturalization Service (INS)[1] commenced removal proceedings against Wang in February 2002, charging him with removability under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I). Wang conceded removability but applied for asylum, withholding of removal, and protection under the Convention against Torture (CAT). In particular, Wang claimed that he had been subject to past persecution on account of political opinion. See 8 U.S.C. § 1101(a)(42) (providing that forced sterilization constitutes persecution on account of political opinion); Matter of C-Y-Z, 21 I. & N. Dec. 915, 917 (BIA 1997) (en banc) (holding that past persecution of one spouse can be established by coerced abortion or sterilization of the other spouse). A hearing was held before Immigration Judge Annie S. Garcy in December 2002.

**1. Hearing before the Immigration Judge**

At his hearing before Judge Garcy, Wang was represented by Yee Ling Poon. Xiomara Davis-Gumbs appeared on behalf of the INS. The IJ's questioning of Wang during his asylum hearing preshadowed her hostile attitude towards him and his claims.

After counsel and the IJ took Wang through a recital of his basic factual allegations, they reached his claim that his parents' pension was being withheld as a penalty for his violation of birth control policy. The IJ questioned Wang as to why he had not paid the fine he was issued as a result of that violation, in order to

---

[1]The Immigration and Nationality Act was amended by the Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2192, 2205 (Nov. 25, 2002), which, on March 1, 2003, transferred the functions of the INS to various bureaus, including the Bureau of Citizenship and Immigration Services within the Department of Homeland Security. The functions of the Executive Office for Immigration Review continue to reside in the Department of Justice, under the direction of the Attorney General. See Dia v. Ashcroft, 353 F.3d 228, 236 n.3 (3d Cir. 2003).

4

restore his parents' pension:

JUDGE TO MR. WANG:

Q. Well, why don't you just pay the fine and solve your parents [sic] problem. I don't understand why you haven't paid it.

A. I do not have the money to pay.

Q. Oh come on. You're here in the United States of America after having paid a smuggler to get here. And a lawyer's working on your case and you're dressed in a suit and tie and you want me to believe that you can't pay $1,500.

A. The money I pay to the snake head [smuggler] I have to borrow money in order to pay the snake head.

Q. So you choose to pay the smuggler instead of paying the fine and protecting your parents [sic] pension. What sympathy do you want from me about that?

A. Not that I do not want to protect my parents. If I will stay in China no one will lend me money to pay the fine.

Q. You're not in China, you're in the United States and you're making money when you work.

A. Yes, I do.

Q. So why do you expect sympathy from me that you choose to pay money to a smuggler instead of protecting your parents [sic] pension?

You must be out of your mind if you think I have sympathy for that.

A.First of all, I believe when government impose fine against my family it's outrageous. Secondly, I owe a lot of money to different sources and I have to pay them back. They force me to. Certainly I do regularly send money back to support my parents.

Q.All these sources that you're describing are a bunch of illegal people who conspired with you for you to be smuggled into the United States. Are those the sources that you're describing to me?

A.Yes, my trip was arranged by snake head.

Q.Well understand clearly, I have no sympathy with your problem about that.

A.R. 129-31.

When Counsel Poon attempted to question Wang further about the pension, the IJ instructed her to "Get off the pension thing," but she then persisted in pursuing the very theme she told counsel to avoid. A.R. 70. Her exchange with Poon went as follows:

JUDGE TO MS. POON:

Q:It's ridiculous. Go away from this issue and move on because it's just insane.

A.I am not trying to stick on it. I'm only trying because I was asked for him to explain why he edit [his asylum claim] now.

Q.I don't even know why he put it in. To me it just makes me more convinced that your client is willing to do anything, even to the detriment of his parents, to take care of himself. You and I both know,

6

there is nothing that happened in this case, nothing in the sworn statement that's even going to begin to explain why he chose to come here at the moment that he did, okay.

A. I will ask him.

Q. And you can ask him and I know what he's going to say. He finally had the money together or whatever he needed to pay the smugglers because there's nothing here at all and maybe we'll learn something suddenly today. That there's nothing here about the timing and there's nothing to convince me that he shouldn't have gone ahead and paid that fine first before he came here.

A. Because he had no money when he was in China.

Q. I don't know about that.

A. That's what he said.

Q. Well, that's what, he can say anything he wants.

> A.R. 134.
>
> When Poon later objected that the government fine for having a second child should not be linked to the engagement of a smuggler to leave China, Judge Garcy responded:

Well, it sure does. He's complaining about how his parents [sic] pension is being taken away because the fine isn't paid, and I'm saying, pay the stupid fine and then complain about it later because if his claim is oh, boo who, you know, this horrible fine is being imposed upon me and I'm entitled to asylum, there's absolutely no reason why the claim can't be made even after the fine gets paid.

7

A.R. 136.

Ultimately, counsel was able to move on to more pertinent issues, such as why Wang's wife did not accompany him to the United States, or travel here instead of him, why he left China when he did, why he would not want to return to China, his dealings with the American Consulate General Office, his employment in China, his understanding of the prevailing birth control regulations and his various encounters with the birth control authorities, his wife's current situation in China and her reasons for returning home after the birth of the second child. In connection with the last issue, the IJ asked Wang:

Q. Why couldn't she have stayed longer than a year and helped take care of that sick relative and everything like that?

A. Because while my wife was there my handicapped child was there as well.

Q. Well, wherever your wife goes the child with the disability goes, right?

A. Yes, yes.

Q. And let's talk about her. Have you ever had medical records about your darling first child Ming Wang brought to the United States of America? Yes or no. I want a short answer, yes or no. Do you have her medical records here, yes or no?

A. Only photos.

Q. Okay. Well why haven't you ever, ever gone to a doctor in the United States with medical records about your first born child to see whether

8

there's a better treatment for her here in this country?

A.I did produce my daughter's old x-ray film to my cousin and my cousin helped me to inquire doctors and we were told that in America she might need operation.

Q.Well why don't you have any medical records here to prove to me that you care enough about your daughter to have asked the doctor here about her welfare?

A.I really indeed care my daughter, but I just was not aware that I need such document be produced into the Court.

Q.Well you care about your daughter, that's interesting because all you write about in your application here is how you want to try to have your wife come here because you're upset about his fine and you're upset about how you can't produce a son.  Why is it in all these pages you've never once made any effort to try to find out whether medical care would be available to your child here potentially even on a visa for her to travel to this country?

A.Indeed I am a father of a child.  I really care for my kids especially my daughter and I just did not, I was just not aware that I need to produce such a particular document to this Court.

> A.R. 174-75.
>
> The Judge eventually moved on to ask Wang about the similarities between his wife's submission to the Court, and his own account. She then again asked Wang why he delayed his departure from China for such a long time.  Wang responded:
>
> A.Actually when my wife was forcefully sterilized I had such desire to leave the country, but as I explained before it's not the easy that whenever you want to leave you want to go to America

you can easily achieve such goal. You have to go through many people's help.

Q. I guess one of the things you had to do was you had to invent some kind of a lie and go over to the Embassy and try to be an imposter and try to lie about trying to get a visa under another name first, that was important for you to try to do that first, is that right? You didn't want to miss a chance to do that now did you?

A. No, not exactly the case. Actually when I, especially my wife was sterilized, my family was persecuted and I did not know many alternatives and eventually my friend help me and obtain the visa for me and try a visa to come here.

A.R. 179-80.

The IJ inquired further as to why Wang's wife has not come to the United States instead of Wang, and then terminated the hearing.

## 2. Oral Opinion of the Immigration Judge

The IJ's oral opinion was consistent in tone and substance with her comments during the preceding hearing. "[E]mbarass[ed]" to have Wang in her court room, in her oral opinion, she described Wang as "obsessed" with having a son and maligned him for "ignor[ing]" his daughter. A.R. 50-51. She reiterated her horror that Wang was interested only in "his wife's ability to reproduce . . . instead of taking responsibility for the child that is in existence at the present time. That is an outrageous thing." A.R. 51. She observed that she was "comfortable denying asylum to the respondent as a matter of discretion because he's a horrible father as far as the Court's concerned because he pays no attention to his daughter except to the extent that a picture of her arm might win the heart of the undersigned so as to have the respondent granted asylum in this Court." A.R. 19. She indicated that she was not bothered "about the respondent's plight." Id.

10

The IJ found Wang's wife's statement of events incredible in part because she too failed to exhibit the sentiments the IJ was looking for. The IJ explained that "[b]oth the respondent and his wife, shocking to the conscious [sic] of the undersigned, make absolutely no comments about how they wish that they could come to the United States for careful medical treatment of their first born daughter who apparently has limited physical mobility in her arms." A.R. 36-37. She concluded from this that "the wife's statement was obviously designed for her to sign" and untruthful. A.R. 37. In her disdain for the Wangs, the IJ seriously considered the possibility that Wang's wife was sterilized after Wang arrived in the United States, perhaps to aid his asylum application. A.R. 39.

In her opinion, the IJ affirmed her earlier characterization of Wang as selfish for refusing to pay the fine for his second child: "That's just so horrible that the respondent would allow his parents to have their pension taken away because the respondent egotistically doesn't want to pay a fine that's imposed upon him and his family." A.R. 43-44. The IJ later continued: "In other words, he thinks it's more ethical to make his wife and his parents suffer than it is to pay smugglers." A.R. 48.

Finding it ridiculous that Wang had not made headway on the fine while working in the United States, the IJ warned Wang: "If the respondent thinks that this Court is going to be sympathetic to the fact that he owes smugglers and he's worried about his welfare here, the respondent is sadly mistaken. There is absolutely nothing noble, not even for 10 seconds in paying a smuggler even one cent of money when the respondent is here in the federal building that houses the United States Attorneys' office" and could file a statement against the smuggler. A.R. 46. Based on this reading of the situation, the IJ found "that the respondent's problem with the fee is self imposed because the respondent has chosen to pay a smuggler instead of paying off a fee." A.R. 52.

In the course of her opinion, the IJ focused repeatedly on Wang's actions towards his elder daughter and parents. The IJ found "infuriating" and "beyond comprehension" that Wang "never even one time did anything honest" on behalf of his disabled daughter, i.e., he allegedly failed to pursue free medical

11

treatment for his elder daughter in the United States. A.R. 44. Accordingly, the IJ chose to humiliate Wang, observing that:

[Wang] [s]pends a lot of time talking about how he can get his wife's sterilization reversed so that he could have more kids and doesn't spend one line talking about what he might do for his child that he actually has. For the child that is alive. For the child that should matter. For the child who apparently can't even feed herself and dress herself. That's a situation that the respondent has crafted that obviously is troubling to the Court because it certainly does reveal somebody who acts with selfishness and who acts with complete disdain for honesty with regard to an application for a non-immigrant visa, and frankly, with complete lack of concern about somebody who he has created.

App. 45-46.

The IJ appeared to believe these considerations were relevant to "the sensibleness of the claim that's presented, discretionary factors that this Court feels comfortable to consider under the Immigration & Nationality Act; and frankly just the law applicable to the case." A.R. 38.

### 3. Appeal to the Board of Immigration Appeals

After the IJ rejected Wang's claims, he appealed her order to the BIA. The BIA, addressing only Wang's asylum claim, dismissed the appeal in June 2004. In a one-paragraph opinion, the BIA upheld the IJ's adverse credibility determination as "not clearly erroneous" and agreed with her that the events described by Wang were "inherently implausible." A.R. 2. As examples of the "inconsistencies and implausibilities" in Wang's account, the BIA wondered why Wang's wife returned home after successfully hiding at her parents' house and why Wang remained in China after the persecution began. A.R. 2-3. It also noted the absence of corroborating evidence showing that family planning officials were penalizing Wang's parents as a result of Wang's birth control policy violation. A.R. 3.

**II.**

12

Wang now appeals the order of the BIA.[2]  Where an opinion issued by the BIA essentially adopts the opinion of the IJ, we review the latter.  See Gao v. Ashcroft, 299 F.3d 266, 271 (3d Cir. 2002).  In this case, the BIA's brief opinion relies heavily on the opinion of the IJ.  Cf. Alaelua v. INS, 45 F.3d 1379, 1381-82 (9th Cir. 1995) (finding that the BIA adopted the IJ's opinion where the BIA failed to analyze the relevant factors in a one-paragraph opinion); Gandarillas-Zambrana v. BIA, 44 F.3d 1251, 1255 (4th Cir. 1995) (reviewing opinion of the IJ directly where BIA adopted the IJ's findings and reasoning in a one-paragraph opinion).  Accordingly, we will review the IJ's conduct and her opinion to the extent that the BIA relied upon them.

In its short opinion, the BIA did cite three "example[s]" of Wang's alleged "inconsistencies": first, Wang's wife returned home after successfully hiding; second, Wang did not immediately leave China after he was denied a birth permit; and third, Wang did not corroborate his claim regarding his parents' pension. None of those three aspects of Wang's account amount to "inconsistencies." Nor is their "inherent implausib[ility]" evident to us.  Since Wang did explain that his wife came out of hiding in order to relieve her parents of the burden of hiding her, and because she wished to return home, and since Wang also explained that it takes time to arrange sufficient funds to exit China illegally, it appears that the BIA relied not on the absence of explanation altogether, but on the perceived absence of "adequate explanation."  Because Wang's explanations do not seem facially unreasonable to us, we conclude that the BIA borrowed that assessment from the IJ and we will review the IJ's credibility determination directly.[3]

_____

[2]As Wang's arguments challenging the IJ's, and later the BIA's, adverse credibility determinations appear directed to both the asylum and withholding claims in their respective orders, we will address both of those claims.  However, because Wang does not meaningfully pursue his CAT claim on appeal, we deem that claim waived.

[3]To the extent that the BIA relied on the alleged absence of adequate explanation for these choices and claims in the

13

Time and time again, we have cautioned immigration judges against making intemperate or humiliating remarks during immigration proceedings. Three times this year we have had to admonish immigration judges who failed to treat the asylum applicants in their court with the appropriate respect and consideration. In a case involving asylum claims similar to those raised here, Zhang v. Gonzales, 405 F.3d 150, 159 (3d Cir. 2005), Judge McKee expressed his concerns about the IJ's apparent "search for ways to undermine and belittle" the alien's testimony, and the possibility that the IJ's decision "was influenced by his view of Zhang's parenting." Id. at 158-59. Also this year, we described an IJ's opinion as "crude" and "cruel," and noted its "hostile" tone and sometimes "extraordinarily abusive," "bullying" and "extreme[ly] insensitiv[e]" behavior. Fiadjoe v. Attorney General, 411 F.3d 135, 144, 146, 154, 155 (3d Cir. 2005). In that case, we concluded that "[t]he conduct of the IJ itself would require a rejection of his credibility finding." Id. at 155. In Korytnyuk v. Ashcroft, 396 F.3d 272 (3d Cir. 2005), we requested that a case be reassigned upon remand and required that the BIA take into explicit consideration "the extreme hostility the IJ exhibited toward [the petitioner] throughout the hearing, commencing at its very inception, as well as the inevitable effect upon an individual seeking asylum of an interrogation conducted in so intimidating a manner by a government official supposed to be a neutral arbiter." Id. at 287 n.20 (internal quotation omitted). A few years ago, in Dia v. Ashscroft, we concluded that an IJ's adverse credibility determination was not supported by substantial evidence because "[h]er opinion consist[ed] not of the normal drawing of intuitive inferences from a set of facts, but, rather, of a progression of flawed sound bites that [gave] the impression that she was looking for ways to find fault with Dia's testimony." 353

---

record, such reliance on the record was misplaced in this case. As we discuss below, the proceedings before the IJ were conducted in too intimidating and hostile a manner to afford Wang a meaningful opportunity to develop the factual predicates of his claim, yet alone to respond to any legitimate concerns about his claim.

14

F.3d 228, 250 (3d Cir. 2003) (en banc). Thus, we have repeatedly sought to remind IJs of their duty to remain neutral and impartial when they conduct immigration hearings. See Abdulrahman, 330 F.3d at 596. We have also noted that "that obligation is especially important where, as in this class of cases, the determinations of the trier of fact are subjected to particularly narrow appellate scrutiny." Id. at 599; see also Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 166 (3d Cir. 1993) ("When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced.").

A disturbing pattern of IJ misconduct has emerged notwithstanding the fact that some of our sister circuits have repeatedly echoed our concerns. In Reyes-Melendez v. INS, the Ninth Circuit held that an IJ violated an alien's due process rights by abandoning her role as a neutral factfinder. 342 F.3d 1001, 1007 (9th Cir. 2003). As that Court described, in that case too the IJ accused the alien of "moral impropriety" and "became aggressive and offered a stream of non-judicious and snide commentary." Id. There also the IJ was rebuked for her "sarcastic commentary and moral attacks" on the alien. Id. In another case, where an IJ appeared to rest an adverse credibility determination at least in part on the fact that the alien had not married the mother of his children, the Ninth Circuit specifically warned that IJs may not use the "personal choices that an asylum applicant has made concerning marriage, children, and living arrangements" to evaluate an alien's credibility. Damaize-Job v. INS, 787 F.2d 1332, 1337 (9th Cir. 1986); see also Abovian v. INS, 219 F.3d 972, 979 (9th Cir. 2000) ("Non-evidence based assumptions about conduct in the context of other cultures must be closely scrutinized.") (citations omitted). In still another case, the Ninth Circuit rejected an IJ's credibility determination because his assessment of certain domestic violence allegations were "skewed by prejudgment, personal speculation, bias, and conjecture." Lopez-Umanzor v. Gonzales, 405 F.3d 1049, 1054 (9th Cir. 2005); see also Hassan v. Gonzales, 403 F.3d 429, 437 (6th Cir. 2005) (concluding that while IJ's language was "brusque" and less than "artful," alien received due process).

In yet another case of improper conduct by an IJ, the Seventh Circuit refused to uphold an adverse credibility

determination by an IJ who aggressively questioned an asylum applicant based on his own assumptions about Catholicism. Huang v. Gonzales, 403 F.3d 945, 950 (7th Cir. 2005). The Court found that the IJ had mischaracterized the alien's testimony and exceeded his proper role. Id. at 950-51. Earlier, in Iliev v. INS, 127 F.3d 638 (7th Cir. 1997), the Seventh Circuit explained why it is so important that immigration hearings are conducted without even the appearance of partiality: "In a country built on the dreams and accomplishments of an immigrant population, a particularly severe wound is inflicted on [the principle that anyone who appears in an American courtroom is treated with dignity and respect] when an immigration matter is not conducted in accord with the best of our tradition of courtesy and fairness." Id. at 643.

The general principle invoked by the Seventh Circuit has long been established by the Supreme Court. "[N]o person [may] be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." Marshall v. Jerico, Inc., 446 U.S. 238, 242 (1980). That assurance is absent – and judicial conduct improper – whenever a judge appears biased, even if she actually is not biased. See In re Antar (SEC v. Antar), 71 F.3d 97, 101 (3d Cir. 1995); cf. Liteky v. United States, 510 U.S. 540, 548 (1994). Public confidence in the judicial system turns on "the appearance of neutrality and impartiality in the administration of justice." LaSalle Nat'l Bank v. First Conn. Holding Gr., LLC XXIII, 287 F.3d 279, 292 (3d Cir. 2002) (citing Primerica Holdings, Inc., 10 F.3d at 157). Thus, even if the IJ was not actually biased – and we do not speculate here as to her state of mind – the "mere appearance of bias" on her part "could still diminish the stature" of the judicial process she represents. Clemmons v. Wolfe, 377 F.3d 322, 327 (3d Cir. 2004). In other words, "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 13 (1954); see also Peters v. Kiff, 407 U.S. 493, 502 (1972).

Nor were the IJ's editorial comments excused on the theory that her apparent bias arose in the course of the immigration hearing itself, rather than from an extrajudicial predisposition against Wang or all similarly situated asylum applicants. First, the IJ's comments seem related to her broader views about family obligations. Second, even if the IJ was reacting spontaneously to

16

Wang's testimony, her attitude still may be characterized as "'bias" or "prejudice" if her comments are so antagonistic or "so extreme as to display clear inability to render fair judgment." Liteky, 510 U.S. at 551, 555. We have previously expressed our disapproval of all "'wrongful or inappropriate' bias, regardless of whether the improper bias arises from evidence adduced at trial or from some extraneous source." United States v. Bertoli, 40 F.3d 1384, 1412 (3d Cir. 1994).

In light of the clear standards governing immigration proceedings, outlined in the above cases, we are sorely disappointed that the IJ here chose to attack Wang's moral character rather than conduct a fair and impartial inquiry into his asylum claims. The tone, the tenor, the disparagement, and the sarcasm of the IJ seem more appropriate to a court television show than a federal court proceeding. But we hasten to emphasize that our concerns about the IJ's opinion are not limited to her choice of words. Substantively, many of the issues addressed by the IJ at length, and to which she gave substantial weight, were irrelevant to Wang's asylum, withholding, and CAT claims. Cf. Reyes-Melendez, 342 F.3d at 1008 ("[T]he IJ's remarks evince her reliance of improper considerations."). The factual issue before the IJ was whether Wang's wife had been forcibly sterilized and whether, if he returned to China, the Chinese government would inflict improper punishment on him for leaving the country. The IJ was not called upon to determine whether Wang was a good father and son. See Zhang, 405 F.3d at 160 (McKee, J., concurring) ("The issue before the Judge was, after all, whether Zhang qualified as a 'refugee,' not the quality of her parenting, or her presence in the home.").

While the IJ explicitly deemed her broad character judgments relevant to her decision, they were not.[4] "The personal

---

[4] We note that even if some of these factors were appropriately considered in the exercise of discretion with respect to Wang's asylum claim, there is no analogue to this discretion in the context of mandatory withholding relief. See INS v. Doherty, 502 U.S. 314, 332-33 (1992) (Scalia, J., concurring in part and dissenting in part).

17

choices that an asylum applicant has made concerning marriage, children, and living arrangement should not be used to evaluate the applicant's credibility concerning his claims of persecution, unless they reflect some inconsistency in a relevant portion of the applicant's testimony." Damaize-Job, 787 F.2d at 1337; see also Dia, 353 F.3d at 249 (adverse credibility determinations are "appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony in view of the background evidence on country conditions") (citation omitted).

In summary, the IJ's opinion in this case was highly improper for both its contemptuous tone and its consideration of personal issues irrelevant to the merits of Wang's asylum claim.

**IV.**

We now have to confront the consequences of the IJ's intemperate remarks and her reliance on irrelevant character evaluations. Wang argued before the BIA that the IJ "apparently misguided her emotions towards the respondent and blinded her own judgment by being emotional and unprofessional." Before this Court, Wang again points to a number of emotionally charged and otherwise irrelevant comments by the IJ, littered throughout her opinion. Wang does not raise a Due Process claim with respect to the IJ's partiality but he does suggest that her apparent negative attitude toward Wang, rather than relevant facts on the record, motivated her adverse credibility determination.

Generally, "if the IJ's conclusion is not based on a specific, cogent reason, but, instead, is based on speculation, conjecture, or an otherwise unsupported personal opinion, we will not uphold it because it will not have been supported by such relevant evidence as a reasonable mind would find adequate. In other words, it will not have been supported by substantial evidence." Dia, 353 F.3d at 250. As a result of the pervasive influence of the IJ's unduly harsh character judgments, we cannot credit her adverse credibility determination in this case.

"[A]n IJ's adverse credibility determination does not pass muster under the substantial evidence rubric when it is not supported by an adequate explanation of the IJ's reasoning." Id. at 254. In SEC v. Chenery Corp., the Supreme Court held that a

"simple but fundamental rule of administrative law [is] that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." 332 U.S. 194, 196 (1947). The corollary to this rule is that the basis of an administrative action "must be set forth with such clarity as to be understandable." Id. at 241; see also Dia, 353 F.3d at 250 ("[P]erhaps because of the difficult nature of these types of cases, and the critical importance of resolving them properly–for the stakes are very high indeed–the soundness of the basis of the decision making, even if experiential or logical in nature, must be apparent."). Although we ask, in evaluating whether an agency determination is supported by substantial evidence, "whether a reasonable fact finder could make such a determination based upon the administrative record," id. at 249, we will not supply the basis for its decision where appropriate reasons are not set forth by the administrative agency itself, see id. at 256 n. 25. See also SEC v. Chenery Corp., 318 U.S. 80, 95 (1943) ("an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.").

Under these principles, it is clear that the IJ's opinion cannot support an adverse credibility determination. See Fiadjoe, 411 F.3d at 155 ("The conduct of the IJ by itself would require a rejection of his credibility finding."); cf. Dia, 353 F.3d at 251 (describing IJ's opinion as "aggregation of empty rationales that devolve into an unsupported finding of adverse credibility"). As in Dia, "the IJ did not rely on her personal observations of Dia's demeanor or any other observations to which we must accord" an especially high degree of deference. Id. at 252 n.23. Instead, the IJ appears to have relied on a number of irrelevant personal judgments, her repetitive recitation of which we deplore. Moreover, the IJ's conduct so tainted the proceedings below that we cannot be confident that Wang was afforded the opportunity fully to develop the factual predicates of his claim. We stress that we have only considered the IJ's findings to the extent that the BIA relied upon them. Based on this review, we conclude that we cannot credit the IJ's conclusions as to Wang's credibility and find that her denial of Wang's claims was unsupported by substantial

19

evidence.

## V.

For the foregoing reasons, we will grant the petition for review. In doing so, we note that, "while we recognize that assignment of an IJ is within the province of the Attorney General, if on remand an IJ's services are needed, we believe the parties would be far better served by the assignment [of] [these] proceedings [to] a different IJ." Korytnyuk, 396 F.3d at 287 n.20 (internal quotation omitted).

―――――