**PRECEDENTIAL**

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT
_____

Nos. 08-2756 & 09-2560
_____

VASIL ABULASHVILI & TEONA KLIBADZE
*Petitioners*
v.

ATTORNEY GENERAL OF THE UNITED STATES
*Respondent*


On Petition for Review of an Order of the
Board of Immigration Appeals
(BIA Nos. A98-769-333 & A98-769-334)
(U.S. Immigration Judge: The Honorable Annie S. Garcy)

Argued February 28, 2011

Before: McKEE, *Chief Judge*, AMBRO, *Circuit Judge*,
and CHAGARES, *Circuit Judge*

(Opinion Filed: November 15, 2011)


Jon Landau (argued)
Baumann, Landau & Simon
510 Walnut Street, Suite 1340
Philadelphia, PA 19106

Michael P. DiRaimondo
DiRaimondo & Masi LLP
401 Broadhollow Road, Suite 302
Melville, NY 11747

   *Attorney for Petitioners*

Lindsay B. Glauner (argued)
Thomas W. Hussey
Ari Nazarov
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

   *Attorneys for Respondent*

OPINION

McKEE, *Chief Judge*.

Petitioners Vasil Abulashvili and Teona Klibadze seek review of an order of the Board of Immigration Appeals dismissing their application for withholding of removal and protection under the Convention Against Torture ("CAT") and an order of the BIA denying their motion to reopen. For the reasons explained below, we hold that the BIA erred in dismissing the Petitioners' application for asylum because the agency's adverse credibility determination is not supported by substantial evidence. We also hold that the BIA abused its discretion in denying the motion to reopen. Finally, we hold that Petitioners' due process rights were violated when Immigration Judge Annie S. Garcy completely took over the cross-examination for government's counsel, and thereby ceased functioning as a neutral arbiter. We will therefore grant the petition for review, vacate the BIA's orders, and remand the case to the BIA for further proceedings.

## I.  Factual Background and Procedural History

Vasil Abulashvili and his wife, Teona Klibadze, are citizens of Georgia, a former U.S.S.R. republic. They entered the United States on visitor visas in 1999 and remained longer than authorized. On December 20, 2004, Abulashvili filed an affirmative application for asylum, withholding of removal, and protection under the CAT. Klibadze was included in the application as a derivative beneficiary

of Abulashvili's asylum claim.[1]   Abulashvili was thereafter placed in removal proceedings, where he renewed and updated his application for asylum.

## A. Asylum Application

In his asylum application, Abulashvili claimed that he had been persecuted in Georgia on account of his membership in the opposition Labor Party of Georgia ("LPG").  He explained that his troubles began in September of 1998, when the passenger minibus he was driving was flagged down by some armed men at the side of the road.   He asserted that one of the men said that his car had broken down and asked that he and his passenger be taken to the home of Koba Buchukuri, the head of the Dusheti district. Abulashvili believed that the passenger of the car was a foreigner, and that the driver was his interpreter.  Abulashvili claimed that he had no choice but to comply because the interpreter appeared visibly afraid of the foreigner and told Abulashvili that the foreigner was a "real crook."  (A.R. 347).  Both individuals got into Abulashvili's minibus.

Abulashvili stated that he drove the foreigner and his interpreter to Buchukuri's mansion, where Abulashvili waited (as requested) until they returned from their meeting. He claimed that, as he waited, he photographed two individuals leaving the mansion. Abulashvili stated in his application that he had heard that Buchukuri and his wife Martina Moldinin, who was a member of the Georgian Parliament, were corrupt and he wanted to record who had been in the mansion.

Abulashvili stated that the foreigner and his interpreter returned from the meeting  together with a man of Chechen descent.[2] As Abulashvili resumed driving, he heard the Chechen and the foreigner conversing in Arabic.  Abulashvili stated that, at some point during the conversation, the foreigner pulled out a gun and began threatening the Chechen, causing the other passengers to panic.  Abulashvili stopped the minibus at that point and several passengers jumped out.  Abulashvili claimed that the foreigner then

---

[1] Because Abulashvili is the lead petitioner and Klibadze is only seeking coverage as a dependent spouse, we will use Abulashvili's name alone when referring to the petitioners.
[2] Abulashvili claimed that he also picked up additional passengers en route to Akhmeta.

fired several shots at the Chechen, who fled the scene. One of the shots hit an 18-year- old female passenger.

According to the asylum application, Abulashvili drove the bleeding girl to a nearby hospital in Akhmeta. The interpreter accompanied Abulashvili to the hospital, and told Abulashvili that he would not testify about the shooting because Buchukuri and other members of the government were likely involved and he was worried about his safety. Abulashvili asserted that the girl never regained consciousness and later died in the hospital.

Abulashvili also claimed that when police subsequently questioned him about the shooting, he explained what had happened but did not reveal that he had taken photographs while waiting outside Buchukuri's home. Abulashvili was held in the police station overnight and, upon his release, the police chief warned him that he should forget everything that had happened.

According to the asylum application, Abulashvili gave the film containing the pictures he had taken outside of Buchukuri's home to the LPG Chairman, Shalva Natelashvili. Shortly afterward, an unknown individual called Abulashvili, questioned his visit to the LPG office, and urged him to mind his own business. The application also noted that the police stopped Abulashvili on October 6, 1998 while he was driving his minibus route and interrogated him about his visit to the LPG office. Abulashvili stated that during the ensuing detention, officers held him upside down, beat him, and threatened to kill him if he revealed what had happened during the September 1998 incident. He was released three days later.

Abulashvili claimed that he moved out of his apartment after his arrest because he feared that the police would continue to harass him. Abulashvili also asserted that in March of 1999 the Ministry of State Security came to his former apartment and arrested Guram Kraveishvili, Abulashvili's former roommate and fellow LPG member.[3] Abulashvili alleged that members of the militia demanded that Kraveishvili tell them about Abulashvili's whereabouts, and that they beat Kraveishvili when he refused to reveal any information.

---

[3] As will be explained later in our opinion, Kraveishvili's last name has also been spelled as "Kravia Shvili" in the record.

4

Three months later, on June 5, 1999, Abulashvili married Klibadze.  On the day of their wedding, Abulashvili claimed that he spotted the interpreter who had been in his minibus during the September 1998 shooting.  The asylum application also states that the interpreter and another man tracked Abulashvili down six weeks after the wedding.  They threatened to inform the police about Abulashvili's whereabouts unless he gave them $10,000.  According to the application, the men beat Abulashvili severely after he told them he could not pay that amount of money.

Abulashvili claimed that he later learned from a television news report that his former roommate (Kraveishvili) had been found dead.  Upon hearing this news, Abulashvili decided to leave Georgia permanently because it was no longer safe for him or his wife to remain there.  They left the country on August 20, 1999.

**B.  Proceedings Before Immigration Judge**

On March 24, 2006, the Department of Homeland Security ("DHS") initiated removal proceedings against Abulashvili for remaining in the United States without proper authorization.   At a hearing before an Immigration Judge, Abulashvili conceded the charge of removability, but argued that he was entitled to relief based upon past persecution and fear of future persecution on account of his membership in the LPG opposition party, and his knowledge of government corruption as determined from the events in September 1998.   Abulashvili testified that he had a close association with the LPG party.   He also claimed that he had been involved in recruiting for the LPG and that the party had helped him establish his minibus service.   He stated that his father had been an active LPG member and had experienced trouble with government officials.  Abulashvili testified further that he believed that he would be harassed by those who had created problems for his father, including Koba Buchukuri, the once-head of the Dusheti district who was now the governor of Mtskheta-Tianeti.  Abulashvili stated that he feared that he would lose his life as well as his family if he returned to Georgia.

On cross-examination, an attorney for the government who had not been present at the first merits hearing began questioning Abulashvili.[4]   That attorney was apparently not familiar with the

---

[4] The first merits hearing took place on May 4, 2006 but did not resume until August 15, 2006.  An Assistant Chief

record and woefully unprepared. He therefore confined his questioning to the number of times Abulashvili had been stopped by the police while living in the United States. A few minutes into the questioning, the IJ took over the cross-examination after determining that the government's attorney was not prepared.

## C. The Immigration Judge's Decision

The IJ denied Abulashvili's asylum application on August 15, 2006. She determined that the application was untimely and that Abulashvili had failed to demonstrate that he qualified for an exception to the time limitation. The IJ further held that even if Abulashvili had timely filed the application, he was still ineligible for relief because his claims were not credible. The IJ defended her decision to take over Abulashvili's cross-examination by noting that the government's attorney had not been prepared. She explained that "[t]he Court is certain that in order to afford the respondent with due process and an opportunity to explain why his testimony in Court is different from his written application, someone needed to ask the respondent about it." (A.R. 89).

Abulashvili appealed to the BIA, challenging the IJ's adverse credibility finding and contending that the IJ's role in questioning him violated his due process right to a neutral arbiter. The BIA dismissed the appeal on May 30, 2008. Like the IJ, the BIA was troubled that Abulashvili's asylum application did not claim that the root of his problems in Georgia could have been due to his father's political activism. The BIA also rejected Abulashvili's claim that his due process rights had been violated. The BIA concluded that the IJ was "ferreting out . . . the facts" and "acquiring clarity in [Abulashvili's] testimony." (A.R. 421)

We thereafter granted Abulashvili's motion to stay removal. Abulashvili then filed a motion to reopen with the BIA based on

Counsel for DHS was present for Abulashvili's direct examination at the first hearing, but did not attend the subsequent hearing in August. Instead, a different DHS attorney attended the August hearing in Yu's place. The IJ noted that this switch in counsel was due to a "genuine mix up," but it is unclear from the record why this mix up occurred. (A.R. 64)

changed country conditions, which the BIA denied because it was untimely.[5]

This petition for review followed. The petition apparently does not challenge the denial of Abulashvili's untimely asylum application. (*See* Pet.'s Brief, at 11).[6] Rather, Abulashvili only challenges the denial of his claim for withholding of removal and relief pursuant to the CAT.

## II. Jurisdiction and Standard of Review

The BIA has jurisdiction over motions to reopen removal proceedings pursuant to 8 C.F.R. § 1003.2(a). We have jurisdiction over Abulashvili's petition for review pursuant to 8 U.S.C. § 1252.

"We review a final order of the BIA denying a motion to reopen for abuse of discretion." *Mahmood v. Gonzales*, 427 F.3d 248, 250 (3d Cir. 2005) (citation omitted). Under this standard, we may reverse the BIA's denial of a motion to reopen if it is "arbitrary, irrational, or contrary to law." *Zheng v. Att'y Gen.,* 549 F.3d 260, 265 (3d Cir. 2008).

Because the BIA's original order of removal adopted the findings of the IJ and discussed the reasons behind the IJ's decision, we review the decisions of both the IJ and the BIA. *See Zheng v. Gonzales*, 417 F.3d 379, 381 (3d Cir. 2005). "Adverse credibility determinations are factual findings subject to substantial evidence review." *Tarrawally v. Ashcroft*, 338 F.3d 180, 184 (3d Cir. 2003). We will defer to and uphold the IJ's adverse credibility

---

[5] Pursuant to 8 C.F.R. § 1003.2(c)(2), Abulashvili should have filed his motion to reopen within 90 days of when the administrative decision became final, or by August 30, 2008. He did not file the motion until November 14, 2008. However, the 90-day time bar does not apply when, as here, an applicant alleges changed country conditions. *Filja v. Gonzales*, 447 F.3d 241, 252 (3d Cir. 2006).

[6] Pursuant to 8 U.S.C. § 1158(a)(3), an alien has one year from time of entry to file for asylum absent "extraordinary circumstances," which are not alleged here. *Tarrawally v. Ashcroft*, 338 F.3d 180, 185 (3d Cir. 2003). That time bar does not apply to requests for withholding of removal or relief under the CAT.

7

determination if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole," *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), but such findings must be based on inconsistencies and improbabilities that "go to the heart of the asylum claim." *Id.*; *see also Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). [7]

## III. Discussion
## A. The Motion to Reopen

Although Abulashvili's motion to reopen was untimely, the BIA may nonetheless consider the motion if it was "based on changed country conditions arising in the country of nationality." 8 CFR § 1003.2(c)(2). Under these circumstances, an alien must: (1) produce evidence demonstrating that conditions have changed in his country of nationality; (2) demonstrate that this evidence is material; and (3) establish that the evidence was not available and could not have been presented at the previous proceeding. *Id.*; *see also Zheng v. Att'y Gen.*, 549 F.3d 260, 265 (3d Cir. 2008).

Here, the BIA found that Abulashvili had met the first and third factors, but not the second. Specifically, the BIA determined there were changed circumstances in Georgia resulting from the August 2008 conflict between Georgian and Russian forces, and acknowledged that this evidence could not have been presented at the previous proceeding. However, the BIA concluded that the evidence was not material because major discrepancies between Abulashvili's asylum application and his hearing testimony established that his testimony was not credible.

The first of these alleged discrepancies pertains to Abulashvili's testimony about his former roommate, Guram

---

[7] The REAL ID Act provides that an adverse credibility determination can be based on inconsistencies, inaccuracies, and other factors, irrespective of whether they go to the heart of an applicant's claim. 8 U.S.C. § 1158(b)(1)(B)(iii). However, the REAL ID Act provisions governing credibility determinations do not apply here because Abulashvili's asylum application was filed on December 20, 2004, before the Act went into effect on May 11, 2005. *See Chukwu v. Att'y Gen.*, 484 F.3d 185, 189 (3d Cir. 2007).

Kraveishvili. The IJ questioned why Abulashvili had testified that the militia had tortured Kraveishvili when he refused to reveal Abulashvili's whereabouts, yet never mentioned in his application for asylum that Kraveishvili had been killed. The IJ considered this omission to be a "very important" factor in her decision to deny Abulashvili's application for asylum. (A.R. 98)

Even a cursory review of Abulashvili's asylum application shows that the IJ was wrong. On the third page of Abulashvili's statement in support of his written application, Abulashvili explained that his roommate had been arrested, beaten and tortured. (A.R. 367). On the next page, Abulashvili wrote that Kraveishvili had been "found dead at the wall of Alvabar cemetery" and Abulashvili stated that it was then that he knew he had to leave Georgia "in order to escape a death." (A.R. 368). Thus, not only did Abulashvili state that Kraveishvili had been killed, he added details such as where the body was found.

Apparently, the IJ either never read Abulashvili's written statement, or she overlooked part of it and concluded that a nonexistent omission was "very important." Either explanation is equally troubling. If the purported conflict between that statement in his asylum application and Abulashvili's testimony was so critical to resolving his claim, the fact that the IJ didn't make a sufficient effort to determine what was actually in the application is both perplexing and disconcerting.

Even worse, both the IJ and BIA were troubled by the different spellings of the name of Abulashvili's former roommate in the record. Abulashvili spelled the name as "Kraveishvili" in his application, yet the person transcribing the hearing testimony spelled the name as "Kravia Shvili." This is hardly the kind of discrepancy that a neutral fact finder would use to discredit one's testimony. The explanation is so obvious that this purported "discrepancy" is hardly worth commenting on. One does not need a doctorate in linguistics to realize that "Kravia Shvili" is a phonetic spelling of "Kraveishvili." After all, Abulashvili did not produce the transcript of his own hearing testimony; a stenographer almost certainly did. It is also safe to assume that the stenographer was not fluent in Georgian and that s/he did not have an ear that was accustomed to Abulashvili's accent. It is hard to understand how anyone could attach such importance to the two different spellings of the

9

roommate's name or conclude that it meant that Abulashvili was referring to two different individuals.

Nonetheless, the BIA concluded that the two men were not the same because "Kraveishvili is described in [Abulashvili's] application as employing the services of the respondent's minibus." (A.R. 420). The BIA thought this inconsistent with Abulashvili's statement in his asylum application that Kraveishvili was his former roommate. However, we know of nothing that would prevent someone's roommate from using certain services just because they happened to be owned by the person he was rooming with. In his asylum application, Abulashvili stated that the Ministry of State Security "came for me in my former apartment in Tbilisi." (A.R. 367). In the next sentence, Abulashvili discussed how members of the Ministry "also arrested Guram Kraveishvili, member of LPG, who took in employment my minibus." (A.R. 367). Taken together, these statements support an inference that Kraveishvili had been Abulashvili's roommate at some point, an assertion that Abulashvili made explicit at the hearing.

Third, the IJ and BIA took issue with Abulashvili's description of where the 18-year old passenger was shot. The IJ pointed out that Abulashvili explained in his application that the girl had been shot outside his minibus, but testified at the hearing that the girl was shot inside and that he did not find her until his minibus had been cleared of all passengers.

Abulashvili stated in his asylum application that he "placed [the girl] in minibus," but never specified where the girl was shot. (A.R. 366). Given the difficulty in comprehending much of Abulashvili's application, which was written without the aid of an interpreter, we are unclear whether placing the girl "in" the minibus can fairly be interpreted to mean moving the girl "inside" the minibus from outside. At the hearing, Abulashvili stated that, when he had written that he placed the girl in the minibus, he simply meant that he moved the girl to the front seat so that she could receive more air and be more comfortable. (A.R. 185). There is nothing inconsistent with that explanation and a statement that the girl had in fact been shot inside the bus. Although we certainly understand why this apparent inconsistency could fairly raise questions, given all of the circumstances here, we have little

10

confidence that the IJ adequately considered Abulashvili's explanation.

In addition, the IJ was baffled by the "sensibility of [Abulashvili] having moved the victim of a gunshot instead of rushing her off to the hospital." (A.R. 73). The IJ's reaction to this portion of the testimony once again suggests that she either did not pay attention to what Abulashvili said, or she simply ignored some of the record. Abulashvili did in fact state that he transported the girl to the hospital after the shooting both in his asylum application and his testimony. (A.R. 144-45, 366). The fact that he took a few minutes to rearrange the bleeding girl so that "she won't get any broken bones" and to secure her seat belt before driving to the hospital does not strike us as incredible. (A.R. 185). A neutral fact finder could just as easily have concluded that the addition of such seemingly inconsequential details made his testimony about the incident more credible, not less so.

We recognize that there were some actual inconsistencies between the asylum application and Abulashvili's testimony. For example, the IJ and BIA were concerned that Abulashvili never mentioned in his application that he feared returning to Georgia because his father had been an active member of the LPG, yet relied on this fact during the hearing. Abulashvili explained at the hearing that he did not include this information in his application because he was relying on a friend to help him complete it, his friend had only a slightly better proficiency in English than he did, and that his friend was pressed for time.

Abulashvili also explained that he did not mention this information during his interview with the asylum officer because the officer could not understand what Abulashvili was trying to say, cut Abulashvili off when he tried to speak, and ended the interview very early. Abulashvili did not realize at the time that he could have brought along an interpreter, and stated that the officer never gave him the option of rescheduling the interview so that an interpreter could attend.

We certainly do not suggest that the IJ or the BIA had to accept Abulashvili's explanations. However, given the problems with the IJ's assessment of Abulashvili's testimony that we have already discussed, it is exceedingly difficult for us to conclude that Abulashvili's explanations were fairly considered.

11

The IJ and BIA also believed it was significant that Abulashvili testified at the hearing that the police confiscated the photos that he had taken outside of Buchukuri's mansion. However, in his asylum application Abulashvili explained that he withheld the photos from the police and gave them to the LPG Chairman, Shalva Natelashvili. When questioned about this apparent inconsistency, Abulashvili said that he meant that the police took his camera with his other belongings and returned the camera to him without the film. He explained that he did not realize that the film was missing until he gave the camera to Natelashvili, who wanted to develop the photos.

Finally, the IJ noted that there was an inconsistency between the number of times Abulashvili stated that he had been arrested. Abulashvili mentioned a third arrest at the hearing that he had not included in his application. When the IJ pointed out the inconsistency, Abulashvili explained that he did not include his last arrest in the application because "it was not done by any kind of militia" and therefore not a "legal or official arrest." (A.R. 205). Although unclear from the record, it appears that although the individuals who seized Abulashvili during this last "arrest" purported to be from the militia, they may have merely been thugs. According to Abulashvili, these individuals took him to a building, where they blindfolded him, held him upside down, and threatened to kill him if he told anyone about the September 1998 events. As we have just stated, the IJ did not have to accept this explanation. However, at least she did have to consider it. Given the apparently cavalier approach to evaluating Abulashvili's claims, we are not at all sure that the explanation was given appropriate consideration.

An adverse credibility finding must be afforded substantial deference so long as the finding is supported by sufficient, cogent reasons. *See Butt v. Gonzales*, 429 F.3d 430, 434 (3d Cir. 2005). We must evaluate whether the credibility determination was "appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony . . . in view of the background evidence of country conditions." *Chen v. Ashcroft*, 376 F.3d 215, 223 (3d Cir. 2004). Thus, minor omissions or inconsistencies that do not go to the heart of an asylum applicant's claim cannot support an adverse credibility determination. *See Kaita v. Att'y Gen.*, 522 F.3d 288, 296 (3d Cir. 2008).

12

Here, the heart of Abulashvili's claim is that he would be persecuted if he returned to Georgia because he was a member of the LPG opposition party and knew about government corruption as evidenced by the September 1998 events. Specifically, Abulashvili claims that he witnessed a government official's potential collusion with a Chechen insurgent and the killing of an innocent bystander. He claims that the Georgian government used its powers of persuasion – including threats of death, beatings, and torture – to discourage him from revealing information about these incidents to fellow LPG party members, who could use that information to their political advantage.

On this record, we cannot conclude that the discrepancies highlighted by the IJ and BIA undermine Abulashvili's claim. Indeed, as we have explained, some of the purported contradictions that the IJ relied upon are not contradictions at all, but resulted from misreading Abulashvili's application, reading only part of it, or ignoring it. To the extent that some unexplained inconsistencies remain, we are left questioning whether those inconsistencies were fairly evaluated.

We also note that "asylum applicants are not required to list every incident of persecution on their I-589 statements." *Pavlova v. INS*, 441 F.3d 82, 90 (2d Cir. 2006); *see also Pop v. INS*, 270 F.3d 527, 531-32 (7th Cir. 2001) ("We hesitate to find that one seeking asylum must state in his or her application every incident of persecution lest the applicant have his or her credibility questioned if the incident is later elicited in direct testimony.").

Before concluding this part of our discussion, we also think it important to stress that the linguistic and cultural difficulties endemic in immigration hearings may frequently result in statements that appear to be inconsistent, but in reality arise from a lack of proficiency in English or cultural differences rather than attempts to deceive.[8]

---

[8] We do not, of course, have any way of knowing all of the dynamics at work in this or any other immigration hearing based upon our review of a cold record. However, given some of the very obvious and troubling problems that we have pointed out here, we think it useful to remind those involved in the process of these difficulties.

Ironically, it is quite possible that Abulashvili undermined his own claim by testifying that he understood and spoke English.[9] Later, when denying Abulashvili's asylum claim, the IJ stated, "The fact that [Abulashvili] has spoken some English reassures the Court that the respondent does have an understanding of the language, and he testified to that effect as well."  (A.R. 87).

Yet the IJ should have realized that Abulashvili's purported comprehension of English was not consistent with the difficulty he had in communicating, and that observation would have required neither familiarity with his language nor any particular expertise in communication theory.

The IJ herself later explained that the majority of Abulashvili's testimony was in Georgian, but that he "has peppered his testimony with English now and then."  (A.R. 63).  In addition, portions of Abulashvili's asylum application are difficult to comprehend and extremely garbled.  For example, when describing the incident where the 18-year old passenger was shot, he explained, "I placed her in minibus and as crazy have gone aside nearby hospital in Azhmeta.  In car except of girl me a translator was."  (A.R. 366).  It is difficult to conclude that Abulashvili could adequately express himself in English.  That may explain why portions of his application are unclear.  Nevertheless, for all of the reasons we have explained, we hold that the adverse credibility determination is not supported by substantial evidence.

## B. Due Process

Finally, Abulashvili argues that his due process rights were violated when IJ Garcy took over the cross-examination at the hearing after determining that the government was not adequately prepared.  Abulashvili contends that the IJ was no longer a neutral arbiter once she assumed the role of counsel.  As noted earlier, the IJ explained that she took such an active role in questioning to

---

[9] At the initial hearing, the IJ asked Abulashvili's counsel what "your client's best language is," to which Abulashvili responded "I speak Georgian, Russian, English."  (A.R. 108). Abulashvili's counsel then asked Abulashvili "Which one's your best?," to which Abulashvili responded "No, it's okay, I speak English."  (A.R. 108).  Abulashvili was later provided a Georgian interpreter at the merits hearing.

14

ensure that Abulashvili could tell his side of the story and that she was therefore trying to ensure his due process rights were protected. (A.R. 421)

"[T]he Due Process Clause applies to all 'persons' within the United States including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). To establish a due process violation, Abulashvili must show that he was denied "a full and fair hearing," which includes a "neutral and impartial arbiter of the merits of his claim and a reasonable opportunity to present evidence on [his] behalf." *See Cham v. Att'y Gen.*, 445 F.3d 683, 691 (3d Cir. 2008). "'No person [may] be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.'" *Wang v. Att'y Gen.*, 423 F.3d 260, 269 (3d Cir. 2005) (quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980)). We review alleged due process violations in deportation proceedings *de novo*. *Abdulrahman v. Ashcroft*, 330 F.3d 587, 595 (3d Cir. 2003).

Here, IJ Garcy had every right to exercise her discretion to question Abulashvili. *See* 8 USC § 1229a(b)(1). However, ""[a]n immigration judge has a responsibility to function as a neutral, impartial arbiter and must refrain from taking on the role of advocate for either party." <u>*Elias v. Gonzales*</u>, 490 F.3d 444, 451 (6th Cir. 2007).
The Due Process Clause cannot tolerate a situation where a supposedly neutral fact finder interjects herself into the proceedings to the extent of assuming the role of opposing counsel and taking over cross-examination for the government. In doing so here, this IJ asked Abulashvili a total of 87 questions. Not surprisingly, once the IJ began cross-examining Abulashvili, the government's attorney did not follow up with a *single question.* (A.R. 209). Why would he since an Immigration Judge was now doing his job for him? We cannot imagine how the IJ could be deemed a neutral arbiter under such circumstances. Moreover, even if she could somehow remain neutral in fact, the appearance was clearly to the contrary. It is not the IJ's function to protect the government by becoming its counsel when its own counsel is not prepared.

IJs must "assiduously refrain from becoming advocates for either party." *Abdulrahman,* 330 F.3d at 596. Even if the IJ did not intend to become an advocate for the government, "judicial conduct

15

[is] improper . . . whenever a judge appears biased, even if she actually is not biased." *See In re Antar* (*SEC v. Antar*), 71 F.3d 97, 101 (3d Cir. 1995). By stepping into the role of the attorney for the government, the IJ gave the strong impression that she was on the government's side. It is difficult to conclude that Abulashvili received a "fair and full hearing" when the IJ ceased being the "neutral arbiter" due process demands and assumed the role of an advocate instead.

We readily acknowledge that an IJ's position is an impossibly demanding and challenging one. This has become increasingly obvious in recent years as IJs are confronted with an exponential growth in their caseloads. The plight of immigration judges shoveling back a sea of cases has been chronicled in several news articles and law journals.[10] In addition, it is often very difficult to

---

[10] *See, e.g.*, Casey Miner, *Judges On the Verge of a Nervous Breakdown*, Mother Jones, Nov. 1, 2010 (explaining that one immigration judge's docket in Minnesota was pushing 1,300 cases at any given time, and that the judge sometimes conducted 50 hearings in a single day**-one every eight minutes**); Peter L. Markowitz, *Barriers to Representation for Detained Immigrants Facing Deportation*, Fordham L. Rev 545 (2009) ("One cannot exaggerate how overburdened and under-resourced the immigration courts are and how *pro se* cases tap those scarce resources disproportionately. In fiscal year 2008, the nation's 214 immigration judges handled on average over 1500 cases apiece. To assist them with this enormous docket, immigration judges shared, on average, one law clerk for every six judges."); Howard Mintz, *Immigration Judges Struggling*, Chi. Trib., Sept. 10, 2009 ("Immigration courts have come under closer scrutiny in recent years as caseloads exploded across the country. The number of immigration cases jumped from more than 282,000 in 1998 to a projected 385,000 this year, with only a modest increase in the number of immigration judges."); Julia Preston, *Study Finds Immigration Courtrooms Backlogged* , N.Y. Times, June 18, 2009 (quoting Judge Dana L. Marks, president of the National Association of Immigration Judges, who explained that "[i]t's a system at its breaking point. How can a system function properly when it is starved from the critical basic resources it needs?").

ascertain the veracity of an asylum applicant's testimony given barriers of language and culture to which we have already alluded. Perhaps this is why the BIA concluded that IJ Garcy was merely engaged in a "ferreting out of the facts" and "acquiring clarity in [Abulashvili's] testimony," as we noted above. (A.R. 421). However, that explanation and the IJ's own explanation would be far more plausible if such interventions were as likely to favor the alien as the government and if the record established that the IJ fairly considered the entire record before making credibility determinations. That does not appear to be the case.[11]

Moreover, it is one thing for an IJ to ask questions, and quite another for an IJ to supplant the role of the government's attorney. On this record, we can have no confidence that the IJ was merely trying to ensure that Abulashvili had a full opportunity to tell his story because, as noted above, the IJ ignored crucial parts of his testimony in finding omissions that simply did not exist. The Due Process Clause does not allow a neutral hearing officer to become the functional equivalent of counsel for one of the parties; yet, that is what appears to have happened here.

## IV. The Appropriate Remedy

Where, as here, we reverse an adverse credibility finding, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *INS v. Orlando Ventura*, 537 U.S. 12, 16

---

[11] Unfortunately, this is not the first time that IJ Garcy's conduct in a hearing has come to our attention. In *Wang v. Att'y Gen.*, 423 F.3d 261, 269 (3d Cir. 2005), we were deeply troubled by her manner of questioning the asylum applicant and noted that her "tone, the tenor, the disparagement, and the sarcasm of the IJ seem more appropriate to a court television show than a federal court proceeding." Similarly, in *Saleh v. Gonzales*, 172 Fed.Appx. 471, 474 (3d Cir. 2006) (unpublished), we noted that "we would be remiss were we not to point out the unprofessional and inappropriate conduct of Judge Garcy, the IJ in this case. On numerous occasions the Judge verbally attacked Mr. Saleh in a manner unbecoming of a neutral and detached arbitrator."

Here, unlike in other cases we have had to review, we do not take issue with the manner in which this IJ questioned Abulashvili. Rather, we are troubled by the fact that she took over the cross-examination for the government.

(2002) (per curiam) (citation and quotation marks omitted); *Butt*, 429 F.3d at 437.  We will therefore vacate the BIA's order dated May 30, 2008 dismissing Abulashvili's application for withholding of removal and relief under the CAT.  We will also vacate the BIA's order dated April 30, 2009 denying Abulashvili's motion to reopen since that was based on the BIA's affirmance of the IJ's adverse credibility determination.  In addition, we will remand the case to the BIA and instruct the agency to assess Abulashvili's evidence without considering the adverse credibility determination. *See Senathirajah v. I.N.S.*, 157 F.3d 210, 222 (3d Cir. 1998) (remanding to BIA with instructions to remand to IJ for decision on asylum and withholding application, but without consideration of erroneous adverse credibility finding reversed on appeal). [12]

In the event that the BIA deems it appropriate to further remand this case to an IJ for another hearing, we strongly recommend that the agency refer the matter to a different IJ in light of the concerns that have arisen in this case, and the appearance of partiality that cannot now be put "back into the tube."  *See Cham v. Gonzales*, 445 F.3d 683,

---

[12] In its April 30, 2009 decision and accompanying order, the BIA did not engage in any independent analysis with respect to Abulashvili's CAT claim, and merely treated it in passing at the end of its decision.  When considering a motion to reopen, the BIA must at the very least "actually consider the evidence and argument that a party presents." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001).  Abulashvili has submitted a detailed report from Mr. Abdoumannob Poulatov, a human rights advocate who has been widely recognized as an expert on country conditions in the former Soviet Union.  According to the report, Poulatov opines that because of Abulashvili's membership in the LPG opposition party, he believes that Abulashvili "will most likely face possible intimidation, attack, and possibly even incarceration and/or torture, if he is forced to return to any part of Georgia."  (S.A. 29).  Although we certainly do not suggest that the BIA must accept Poulatov's conclusions, the agency should have at the very least considered them.  On remand, the BIA should carefully consider the evidence presented in support of Abulashvili's withholding of removal and CAT claims.

694 (3d Cir. 2006) (citing *Sukwanputra v. Gonzales*, 434 F.3d 627, 638 (3d Cir. 2006)). "[W]hile we 'recognize that assignment of an [IJ] is within the province of the Attorney General,' if on remand an IJ's services are needed, we believe 'the parties would be far better served by the assignment to those proceedings of a different IJ.'" *Korytnyuk v. Ashcroft*, 396 F.3d 272, 287 (3d Cir. 2005) (quoting *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1055 n.4 (9th Cir. 2002)).

## V. Conclusion

For the reasons set forth above, we hold that the BIA erred in dismissing Abulashvili's application for withholding of removal and protection under the CAT. We further hold that the BIA abused its discretion in denying Abulashvili's motion to reopen. Finally, we hold that Abulashvili's due process rights were violated when the IJ assumed the role of the government's attorney. We will therefore grant the petition for review, vacate the orders of the BIA, and remand the matter to the BIA for additional proceedings consistent with this opinion.