

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-11-2009

# Issiaka v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 07-2691

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Issiaka v. Atty Gen USA" (2009). *2009 Decisions.* Paper 1103.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1103

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-2691
_____

BAYO ISSIAKA,

Petitioner

v.

ATTORNEY GENERAL OF
THE UNITED STATES,

Respondent

_____

Petition for Review of an Order of
the Board of Immigration Appeals
Agency No. A98-690-456
(Immigration Judge Miriam K. Mills)

_____

Argued: October 29, 2008
_____

Before: MCKEE, NYGAARD, and MICHEL,[*] <u>Circuit Judges</u>,

(Filed: June 11, 2009)

Laetitia B. Creech, Esq. (Argued)
1238 Broad Street, 1st Floor
Philadelphia, PA 19146

    *Attorney for Petitioner*

Richard M. Evans, Esq.
Nancy E. Friedman, Esq. (Argued)
Joan E. Smiley, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

    *Attorneys for Respondent*

---

OPINION

---

[*] The Honorable Paul R. Michel, Chief Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

MCKEE, *Circuit Judge*:

Bayo Issiaka petitions for review of a final decision of the Board of Immigration Appeals ordering his removal to the Ivory Coast and denying his applications for asylum, withholding of removal, and protection under the Convention Against Torture.  We have jurisdiction pursuant to 8 U.S.C. § 1252(a).  For the reasons explained below, we will grant the petition and remand this matter to the Board for further proceedings.

## I. Background

Bayo Issiaka, a native and citizen of Cote d'Ivoire (the "Ivory Coast"), claims to have traveled to the United States as a stowaway aboard a cargo ship, and to have arrived in the United States in December 2003.  He filed an asylum application on December 13, 2004, and was subsequently given notice of removal because he had not legally entered the United States.  Thereafter, Issiaka conceded removability, but requested relief in the form of asylum, withholding of removal, and relief under the Convention Against Torture (the "CAT").

At a hearing before an Immigration Judge (Hon. Miriam Mills), Issiaka testified that his father had worked as a chauffeur for General Robert Guei, Cote d'Ivoire's deposed military leader.  On September 19, 2002, Guei and Issiaka's father were killed by government troops during an apparent coup attempt.  The next day, soldiers came to Issiaka's home in Abidjan.  The soldiers shot and killed Issiaka's mother, and forcibly took Issiaka and his brother to a military camp.  According to Issiaka, at the camp, he was  beaten with sticks and his brother was tied

to a car and dragged to his death.

While Issiaka was being detained at the camp, a family friend named "Colonel Bakayioko," arrived at Issiaka's home and discovered that Issiaka's mother had been killed. The colonel retrieved some of the family's identification papers and drove to the military camp where Issiaka was being held. According to Issiaka, he was able to leave the camp and flee to a friend's house in the village of San Pedro with the Colonel's help. There, a doctor treated the wounds inflicted during Issiaka's beating.

Issiaka testified that in November 2003, he snuck aboard a cargo ship bound for the United States. He also said that, since arriving in the United States, he has been in touch with his aforementioned friend in San Pedro, as well as with other friends in Abidjan, and with his uncle. The uncle sent Issiaka copies of some identification documents that were in the possession of Issiaka's former employer.

The Immigration Judge rejected the asylum claim as untimely because Issiaka could not establish that he filed his asylum petition within one year of his arrival in the United States. *See* 8 U.S.C. § 1158(a)(2)(B). The IJ also denied the application for withholding of removal and CAT relief, because the IJ concluded that Issiaka was not credible. The IJ based the adverse credibility determination on inconsistencies in Issiaka's testimony, his lack of specificity regarding his head wounds, his failure to mention any medical treatment for those wounds in his written asylum application, and the absence of corroboration.

-4-

Issiaka appealed to the Board of Immigration Appeals, but the Board affirmed the IJ's ruling in a brief *per curiam* opinion. The Board agreed that the asylum application was not timely, and that Issiaka was not credible. This petition followed.

## II. Standard of Review

Because the Board implicitly adopted the findings of the Immigration Judge while discussing the IJ's conclusions, we review the decisions of both the Board and the IJ. *See Xie v. Ashcroft*, 359 F.3d 239, 242 (3d Cir. 2004). Our review is subject to the familiar "substantial evidence" standard. Accordingly, we must determine if the conclusions of the IJ and Board are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir. 1998) (quoting *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). Adverse credibility determinations must be based on "specific, cogent reasons." They must not rest on "speculation, conjecture or . . . otherwise unsupported personal opinion." *Dia v. Ashcroft*, 353 F.3d 228, 250 (3d Cir. 2003) (en banc). Similarly, adverse credibility findings may not rest upon minor inconsistencies that do not go to the "heart of the asylum claim." *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) (quoting *Ceballos-Castillo v. INS* 904 F.2d 519, 520 (9th Cir. 1990)).

## III. We Lack Jurisdiction to Review the Asylum Claim.

Issiaka concedes that we do not have jurisdiction to review the agency's determination that his asylum petition was untimely. *See* 8 U.S.C. § 1158(a)(3); *Sukwanputra v. Gonzales*,

434 F.3d 627, 633 (3d Cir. 2006). Thus, we review only the agency's denial of withholding of removal and his claim for protection under the CAT.

## IV. Adverse Credibility Determination

In its brief *per curiam* opinion, the Board found no clear error in the IJ's adverse credibility determination. The Board explained:

> [T]he Immigration Judge found the respondent's testimony regarding his head wounds lacks credibility because of his inability to reasonably describe his injury []. The respondent testified that a doctor gave him pain killers for his injuries, though he failed to testify that he received stitches []. In addition, the respondent failed to mention in his Statement that he sought medical treatment []. We find that the Immigration Judge's credibility analysis comports with the standards applicable in the United States Court of Appeals for the Third Circuit . . . .

App. 2 (record citations omitted). That adverse credibility determination provided the sole ground for denying Issiaka's petition for withholding of removal. After reviewing the record, we conclude that the reasons given to justify rejecting Issiaka's testimony are not supported by substantial evidence.

With regard to his head wounds, Issiaka's written statement in support of his application for relief states as

follows:

> They threw my brother and me on the pile of dead bodies. They took wood from the trees and began beating us with the sticks. I suffered cuts to my forehead, the top of my head, and my shin. . . . I was taken [by a family friend] to my friend's house in San Pedro, and cleaned up my wounds. I had been cut on the forehead, on the top of my head, and on my shin when the soldiers were beating me at the army camp. . . . I did not try to leave from San Pedro at that time, as I feared that the army would find me on my way out. It took me about a month or two to get better and heal.

App. 207-208.

At the hearing before the IJ, the following exchange occurred about Issiaka's wounds:

> ISSIAKA: Because I have a, I have, because I have beaten by the military on my head and they have wounded. That's why I needed the medication.
> JUDGE: What was wrong with your head?
> ISSIAKA: That's what you can see it's --
> JUDGE: Does he have a scar on his head?
> PETITIONER'S COUNSEL: Yes.
> ISSIAKA: Yes, I have the scar you can see that.
> JUDGE: I can kind of see it from here. All right . . . .

* * *

> JUDGE: Describe the head wound that you said you suffered?
> ISSIAKA: I did not understand the question.
> JUDGE: You said you, you showed me a head scar first

of all.  It might be eight inches long, I'm not real clear from here.  Why don't you come up here and let me look at your head.

ISSIAKA:  Yeah, not a problem.

JUDGE:  Okay, show me where the scar is.  Are you talking about this here? Oh, well, let me see.  Okay, now not eight inches but yeah, there are scars on his head.

JUDGE:  (To counsel for the government) You want to look at it? Maybe about two inches here and there.  Okay, yeah.

JUDGE:  (To Issiaka) Okay, I want you to tell me then, what did the original wound look like that you have scars like that? What did your original wounds look like?

ISSIAKA:  You mean, you, you, you like to know how I was wounded? I did not understand the question.

JUDGE: Right.  What did it look like after they beat you in the head with a stick? What did your head look like?

ISSIAKA:  I was bleeding all over the body I was covered.

JUDGE:  So were they open gashes in your head? Open wounds or what? Or was it just a bump.  You must know what your wounds looked like, okay, and this is important.

ISSIAKA:  Yes, they were really open wounded. Anybody could see and see that it was wounded.

JUDGE:  How many open wounds did you have on your head from the stick that they beat you with?

ISSIAKA:  I had three wound on my head and I have one on my foot.

JUDGE:  And how deep were they do you know, about?

ISSIAKA:  Deep?

JUDGE: Did you look in the mirror when you got to your friend's house to see what your head looked like at any time? Or while the colonel was driving you to San Pedro.

ISSIAKA:  Yes.  Oh, they were serious, very serious.

JUDGE:  So tell me what the wound looked like, what these head wounds looked like?

ISSIAKA:  It was very serious, very, very deep wounded

and my brother helped me clean up the wounded. I don't know how I can explain it but it was very serious.

JUDGE: You can't describe what you saw in the mirror. Did you look in the mirror at the head wounds at any time?

ISSIAKA: No, that I look myself at the mirror after I had been treated.

JUDGE: Oh, okay. So what kind of you said you got pain killer from the doctor. Anything else from the doctor for these head wounds?

ISSIAKA: Yes.

JUDGE: What else?

ISSIAKA: He gave me an injection or two.

JUDGE: Okay, and how did you know you even had these h[e]ad wounds if you didn't look in the mirror?

ISSIAKA: I don't understand the question.

JUDGE: You were beaten badly by military with sticks and you got h[e]ad wounds. How do you know the wounds were bad enough that you needed treatment?

ISSIAKA: When I touched it I could tell that there was wounded.

JUDGE: What did it feel like when you touched it?

ISSIAKA: When you touched the wounded if it's serious you can tell it, if it's not serious you can tell it too.

App. 91-95.

Issiaka explained how he was injured, how many cuts he believed were on his head, and that the wounds were "serious," "deep" and "open." Moreover, he repeatedly said that he did not understand the IJ's questions. That is certainly understandable; we have difficulty understanding them too. The IJ kept pressing

-9-

Issiaka to provide more detail about his wounds, and the Board cited Issiaka's failure to be more specific as support for affirming the IJ's denial of relief. However, it is not the least bit apparent what additional explanation or description the IJ or the Board thought Issiaka could provide. The adverse credibility determination is especially puzzling because the IJ examined Issiaka's head and acknowledged that he had scars. From the testimony quoted above, it certainly appears that the scars were significant and consistent with serious injuries, not a "bump" as the IJ's questioning suggested.

Issiaka also provided photographs of himself with bandages on his head. The IJ accepted that evidence although she questioned why Issiaka was bald in some of the pictures and had hair in others. Issiaka explained at the hearing that the pictures were taken approximately two months apart. App. 112-13. That not only explains why he would have hair in some of the pictures and be bald in others, it is absolutely consistent with the supporting statement in his application that it took "about a month or two to get better and heal." App. 208. Moreover, if he was examined by someone after the beating, it is reasonable to assume that the person examining him would have had to shave his head. It is therefore troubling that the IJ concluded that the fact that Issiaka had hair in some pictures and was bald in others somehow undermined Issiaka's credibility. We can not help but think that a neutral assessment of that evidence would have corroborated his testimony, not weakened it.

Thus, there is no basis for the Board's conclusion that Issiaka "lack[s] credibility because of his inability to describe his injury." It is hard for us to imagine how one would describe

-10-

a bleeding head wound (or wounds) other than to say that he was bleeding from the head after being hit on the head with sticks. That is what Issiaka said. The IJ's insistence that Issiaka testify about how "deep" his wounds were is not only illogical, it is more consistent with an effort to undermine his credibility than to fairly assess it.[1] Not surprisingly, (and to its credit), at oral argument before us, even counsel for the government had to concede that this ground for disbelieving Issiaka was troubling.

We are also at a loss to understand the Board's concern that "[Issiaka] failed to testify that he received stitches." His petition does not say he received stitches, nor did he testify that he received stitches. He did testify that his friend helped him clean his wounds, and that a doctor gave him some pills for pain and an "injection or two." Issiaka's failure to testify that he received stitches is neither puzzling nor suspicious. We doubt that stitches are always appropriate for all head wounds, and not everyone who needs stitches is fortunate enough to have access to that level of treatment. Moreover, even "if best practices" would require that Issiaka receive stitches, there is nothing here to suggest that he had access to that kind of medical care. He was, after all, in rural West Africa, and it appears that the IJ never even considered that circumstance or context before drawing a negative inference from Issiaka's failure to say that he received stitches.[2] Neither the Board nor the IJ should expect

---

[1] A head wound is not, after all, a wound to a fleshy part of the anatomy.

[2] Furthermore, it is unclear from the record how much time elapsed between the beating and Issiaka's meeting with a doctor. If a significant time passed, it may be that stitches would have been inappropriate even if they were otherwise indicated. Yet, the IJ never considered that when attaching significance to the absence of testimony about stitches.

Issiaka to have access to the kind of medical attention that is taken for granted in the United States.[3]

We realize that Issiaka did not mention that he received any treatment in his asylum petition. However, that is an exceedingly minor omission given the nature of the beatings that he did describe, and the minimal medical attention he received sometime later. Moreover, the statements in his petition are internally consistent. Had Issiaka failed to mention a long stay in a hospital or a major surgical procedure in his petition, skepticism would have been justified. However, failing to mention that a wound was cleaned and that he received pain killers doesn't strike us as an "inconsistency." *See Senathirajah v. I.N.S.* 157 F.3d 210, 221 (3d Cir. 1998) ("The procedures for requesting asylum and withholding of deportation are not a search for a justification to deport.")

## V. Issues on Remand - Quality of Translation

The Board's affirmance rested primarily on the adverse credibility determination that we have just discussed and found wanting. Nevertheless, the IJ enumerated some additional grounds for disbelieving Issiaka's testimony we must determine if the record as a whole contains substantial evidence to support the denial of relief. However, it is difficult for us to review the remainder of the record because of the poor quality of the translation and transcription. The portion of the transcript reproduced above demonstrates some of the less serious difficulties the judge, translator and petitioner were having

---

[3] This is particularly true when we consider that nothing in Issiaka's testimony suggests that the environment in which he finally received medical attention may well not have been the kind of sterile field that would have allowed sutures.

communicating with each other. The difficulties are better illustrated by the following exchange:

JUDGE: All right, and Jabadi Kaulfa knew Colonel Bata Yoko (phonetic sp.)?

ISSIAKA: Huh?

JUDGE: A colonel drove you to Jabadi's house, is that correct? Can you understand the interpreter?

GOVERNMENT COUNSEL[4]: I think that question was misstated.

JUDGE: Yeah, and I don't even speak French.

INTERPRETER: (To Judge) Yes. Can you repeat that question.

JUDGE: Yes.

JUDGE: (To Issiaka) You stated in your application that a Colonel Bata Yoko drove you to San Pedro?

GOVERNMENT COUNSEL: Judge, may I clarify for the interpreter?

JUDGE:Yes.

ISSIAKA: Yes.

JUDGE: Okay, so did Jabadi see the colonel when he dropped you off?

ISSIAKA: Yes.

JUDGE: Okay. And why didn't you put in your application anything about you were treated by a doctor for your wounds?

GOVERNMENT COUNSEL: That question needs to be clarified.

ISSIAKA: I did not understand that question.

---

[4]Although counsel for the government, Ms. Dussek, speaks some French, there is nothing to establish her degree of fluency or whether she is familiar with any unique or accent that may have been involved.

JUDGE: Okay. How well are you understanding our interpreter?

ISSIAKA: I don't have any problems.

JUDGE: (To Interpreter) Okay, how well do you understand him?

INTERPRETER: I don't have any problem either.

JUDGE: Okay. But he keeps not understanding me but I don't know. If you're translating my English okay I don't understand why he doesn't, you know, understand my question. I'm talking to you. Is French your first language?

INTERPRETER: Yes.

JUDGE: What country are you from?

INTERPRETER: Rwanda. The only problem is accent, no offense, but we do understand each other.

JUDGE: (To Counsel for Issiaka) Okay, you don't have any objections to our interpreter here?

COUNSEL FOR ISSIAKA: For the time being, no.

App. 95-97.

Issiaka's attorney failed to object to the problems with translation during the hearing, and also failed to raise any issue about the quality and accuracy of the translation before the Board. Nevertheless, it is readily apparent from reading the transcript that there were translation problems somewhere between Issiaka, the translator and the questioner. For example, more often than not, Issiaka's answers were not responsive to the question asked as it appears in the transcript. Although this could be evidence of evasiveness, given the number of times that Issiaka answered "I don't understand," the IJ should have been alerted to the very real possibility of a communication problem between Issiaka and the translator.[5] Here, the IJ was

---

[5] Towards the end of the hearing, the translation problem was brought up again:

clearly aware of this problem and elected to continue with the hearing anyway.

Because of the apparent problems with translation and

---

GOVERNMENT COUNSEL: (To Issiaka) So why did you leave your documents with your employer for more than four years, your former employer? Why would he have your ID documents for work for four years? Do you know?

ISSIAKA: I didn't meant that because I left and I left my bag on the table. I didn't thought it was a problem.

GOVERNMENT COUNSEL: But you said you needed these documents in case anything happened to your parents. Isn't that true?

ISSIAKA: Yes, but I was always in a Abidjan.

GOVERNMENT COUNSEL: Well, you, you returned to your former employer after 1998 exactly?

GOVERNMENT COUNSEL: (To the Judge) The only problem with the translation is the numbers is that the, the interpreter uses the Swiss numbers for 90 –

JUDGE: Uh-huh.

GOVERNMENT COUNSEL: And that's why he has trouble understanding the, the 90 numbers. But he's corrected himself several times, which is good.

JUDGE: Okay.

INTERPRETER: (To Counsel for the government) Yeah, I'm sorry. He, he has French. I just cannot get French.

GOVERNMENT COUNSEL: Right.

INTERPRETER: Could you please repeat the question?

App. 123-124.

-15-

transcription we are reluctant to rule on the IJ's remaining justifications for doubting Issiaka's credibilty.   The IJ concluded that Issiaka "failed to reliably and reasonably prove his identity" or provide an adequate explanation of how he obtained copies of his family's identification cards or why he could not produce the originals.  The IJ was also concerned at Issiaka's failure to provide written corroboration of his story from the friend he stayed with after fleeing Abidjan.[6]  Yet, we cannot conclude that these findings are adequately supported by substantial evidence because the written record is too muddled to allow intelligent review.[7]  The Court of Appeals for the Ninth

---

[6] The IJ found that Issiaka's asylum petition was not timely filed because port records showed that the ship that arrived on the date Issiaka claimed his ship arrived embarked from a different city than Issiaka had reported.  The IJ therefore found that Issiaka had not proved that his petition was filed within one year of his arrival in the United States.  Neither the IJ nor the Board cited this discrepancy as a reason for disbelieving any other part of Issiaka's story.  Issiaka did provide medical records and affidavits from persons he met upon his arrival in Philadelphia that support his story of arriving as a stowaway.

[7] Other examples of the garbled nature of the transcript include:

ISSIAKA:  My father was a driver and my mother was alone in the house and she has been killed because of the politics.
JUDGE:  Well, what happened?
ISSIAKA:  It's because my father was (indiscernible) driver and December 10th when left the (indiscernible) to come to Abidjan and then, 19th December, 2002 they were careful, very, very careful in the city President (indiscernible) was (indiscernible) in the city.

-16-

Circuit has held that even where no due process violation has been raised, "faulty or unreliable translations can undermine the evidence on which an adverse credibility finding is based." *He v. Ashcroft*, 328 F.3d 593, 598 (9th Cir. 2003) (citing *Balasubramanrim v. INS*, 143 F.3d 157, 162-64 (3d Cir. 1998). We agree, and we think this is such a case. *See also Kaita v. Att'y Gen.*, 522 F.3d 288 (3d Cir. 2008) (vacating adverse credibility determination where record showed obvious translation problems and portions of the record were essentially unintelligible).

---

App. 100.  And:

> JUDGE:  And when the colonel found [the bag], what did it contain, if you knew?
> ISSIAKA:  All my IDs.
> JUDGE:  Including your family's IDs, your brother's ID, your mother's ID and your father's ID?
> ISSIAKA:  Yes.  I had none, only my brother I had no sister.
> JUDGE:  Well, all you provided are copies.  So were there original identification cards in that bag when you received it?
> ISSIAKA:  Yes.
> JUDGE:  And so what did you do with the original identification cards?
> INTERPRETER:  He did not understand the question.
> ISSIAKA:  I lost one of the originals.  I lost many of the old, even the photo I was looking for I couldn't find it.
> JUDGE:  Which one did you lose? Who's [sic] identification card did you lose?
> ISSIAKA:  When I, when I lost my ID in 1992, when I lost my ID in 1998 and that's the document they had to renew.  The original from this copy I lost it.

App. 106.

On remand, we strongly encourage the government to ensure that an interpreter who is familiar with Issiaka's native language, dialect of French and any accent. We are all sufficiently familiar with how strong accents can interfere with understanding one's own language. We do not know if that is what happened here, but it is clear that the record does not lend itself to the kind of review to which both Issiaka and the government deserve.

## VI. Remedy

Because the adverse credibility finding is not supported by the record, we will grant the petition for review. However, we are not able to determine if Issiaka is entitled to relief from removal because of the problems we have identified with the transcript. Accordingly, we will remand to the Board for further proceedings consistent with this opinion. If further development of the record is required, we strongly encourage that the Board remand the matter to a different IJ. *See Sukwanputra*, 434 F.3d at 638. The prosecutorial manner of this IJ during Issiaka's hearing and the inquisitorial inquiry that underpins some of the IJ's reasons for rejecting Issiaka's credibility cause us to conclude that everyone is better served by having another "pair of eyes" evaluate Issiaka's credibility if the Board concludes that the record must be developed further.