PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 19-1408, 20-2078

———————

B.C.,[1]
                    Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

———————

On Petition for Review of a Final Order
of the Board of Immigration Appeals
(Agency No. A216-285-558)
Immigration Judge: John P. Ellington

———————

Argued on January 12, 2021

Before: AMBRO, KRAUSE, and PHIPPS, Circuit Judges

(Opinion filed: September 1, 2021)

---

[1] We have authorized the petitioner to proceed
pseudonymously.

Benjamin J. Hooper
Pennsylvania Immigration Resource Center
294 Pleasant Acres Road, Suite 202
York, PA 17402

Arthur N. Read
Justice at Work
990 Spring Garden Street, Suite 300
Philadelphia, PA 19123

Sozi P. Tulante **(Argued)**
Dechert
2929 Arch Street, 18th Floor, Cira Centre
Philadelphia, PA 19104

Counsel for Petitioner

Merrick Garland
Carmel A. Morgan
Lisa Morinelli
Tim Ramnitz **(Argued)**
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

Counsel for Respondent

Matthew J. Lamberti
Community Justice Project
100 Fifth Avenue, Suite 900
Pittsburgh, PA 15222

Counsel for Amici American Immigration
Council, American Immigration Lawyers
Association, Casa San Jose, Florence Immigrant
and Refugee Rights Project, National Immigrant
Justice Center, Northwest Immigrant Rights
Project, and Unitarian Universalist
Congregation of York

Michael Broadbent
Cozen O'Connor
1650 Market Street
One Liberty Place, Suite 2800
Philadelphia, PA 19103

Counsel for Amici Guatemalan-Maya Center,
Legal Aid Foundation of Los Angeles, Kids in
Need of Defense, and Southern Poverty Law
Center

Mary Beth Lyon
Cornell Law School Clinical Program
133 Hughes Hall
Ithaca, NY 14853

Counsel for Amici Black Alliance for Just
Immigration, Public Justice Center, Capital
Area Immigrants' Rights Coalition, and Dolores
Street Community Services

Edward J. Sholinsky
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA 19103

      Counsel for Amici HIAS Pennsylvania,
      Esperanza Immigration Legal Services, Chris
      Rabb, AFRICOM, and VietLead

Sarah H. Paoletti
University of Pennsylvania School of Law Transnational
Legal Clinic
3501 Sansom Street
Philadelphia, PA 19104

      Counsel for Amici Zeid Al Hussein, Fernando
      Chang-Muy, Juan Mendez, Jennifer Moore,
      Anne C. Richard, David Robinson, Michel
      Gabaudan, Ian Matthew Kysel, Jaya Ramji-
      Nogales, and Eric Schwartz

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

The stakes in removal proceedings—whether a noncitizen[2] will be deported—could hardly be higher. But despite the high stakes, the outcomes of these proceedings sometimes turn on minutiae. Small inconsistencies in a noncitizen's testimony can doom even those cases that might otherwise warrant relief. To ensure testimony is not unfairly characterized as inconsistent, a noncitizen must be able to communicate effectively with the officials deciding his case. Because language barriers can make effective communication impossible, our Court has long recognized the importance of a competent interpreter to ensure the fairness of proceedings to individuals who do not speak English. But what happens if an immigration official does not make a meaningful effort to determine whether a noncitizen has limited proficiency in English?

Our case exemplifies this problem. Petitioner B.C., a native of Cameroon, primarily speaks "Pidgin" English, and reports that he has only limited abilities in the "Standard" English in which we write this opinion. He fled from Cameroon to the United States after allegedly facing

---

[2] We use the term "noncitizen" as equivalent to the statutory term "alien." *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (citing 8 U.S.C. § 1101(a)(3)).

persecution at the hands of his government. Soon after his arrival, the United States Department of Homeland Security began removal proceedings against B.C., and he applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). In a series of interviews and hearings, immigration officials either presumed he spoke "Standard" English or gave him an unhelpful, binary choice between "English or Spanish" or "English or French." And despite persistent clues that he was less than fluent in "Standard" English, he was left to fend for himself in that language without an interpreter. The record shows this resulted in confusion and misunderstanding. Relying on purported "inconsistencies" in the statements B.C. made without the help of an interpreter, the Immigration Judge ("IJ") denied his applications on the ground that he was not credible, and the Board of Immigration Appeals ("BIA") affirmed. When presented with additional country conditions evidence, expert reports on the linguistic differences between "Standard" and "Pidgin" English, and B.C.'s card showing membership in an allegedly persecuted group, the BIA denied his motion to reopen.

We hold that B.C. was denied due process because the IJ did not conduct an adequate initial evaluation of whether an interpreter was needed and took no action even after the language barrier became apparent. Those failures resulted in a muddled record and appear to have impermissibly colored the agency's adverse credibility determination. We therefore vacate the BIA's decisions and remand for a new hearing on the merits of B.C.'s claims. On remand, the agency must also remedy other errors B.C. has identified, which include dealing with the corroborative evidence he submitted.

6

## I. Background

### A. "Standard" English vs. "Pidgin" English

Because the question of law in this appeal ultimately turns on B.C.'s particular English language abilities, we begin by examining the differences between "Standard" and "Pidgin" English. These observations are drawn from the reports of two linguistic experts submitted as exhibits to B.C.'s motion to reopen.

It is undisputed that the primary language spoken in B.C.'s childhood home was "Cameroonian Pidgin English,"[3] which is derived from "Standard" English[4] but has evolved into a "distinctly separate language . . . with its own grammatical and linguistic structure." A.R. at 102. Take, for example, the following sentence in "Standard" English: "[I]f it were me," "I would not let him come and visit the children." A.R. at 89. Translated into "Pidgin" English, this sentence would read, "If na mi, a no go gri meik I kam visit dat pikin dem." *Id.* Setting aside the various ways in which the "Pidgin" English sentence might be unintelligible to the "Standard" English speaker (and vice versa), a listener is likely to misunderstand key phrases without proper translation. Translated into "Pidgin" English, "if it *were* me" becomes "if na mi," which a "Standard" English speaker could take to mean "if *not* me." *Id.* (emphasis added).

---

[3] In addition to "Pidgin" English, B.C. speaks the Akum language. He also received some instruction in French during secondary school, though it is not clear how fluent he is in that language.

[4] We use the parties' terminology to refer to these two languages.

7

Although "Pidgin" English speakers "may understand their language to be 'a version' of ['Standard'] English," a person who is proficient in "Pidgin" English is not automatically proficient in "Standard" English. A.R. at 90. Instead, a "Pidgin" English speaker who wishes to communicate in "Standard" English must learn it as a second language. *Id*. B.C. did not have the benefit of a full education in "Standard" English; he learned some "Standard" English in his village primary school but was given no further "Standard" English instruction thereafter and asserts he was not proficient in that language when he entered the United States.

## B. B.C.'s Alleged Persecution in Cameroon

Speakers of "Pidgin" English, like B.C., are considered "Anglophones" in Cameroon. He reports that Francophones, including the predominantly Francophone Cameroonian government, "do not accept Anglophones in the community and treat them as second-class citizens." A.R. at 238, 348, 440. B.C. claims he was subjected to particularly egregious mistreatment because he was a supporter of an opposition party called the Social Democratic Front ("SDF") and a member of the Southern Cameroon National Council ("SCNC"), a non-violent political group that advocates for independence from Francophones. B.C. reports that the Cameroonian government arrested and detained him twice as a result of his support for these groups. More gravely, he claims military officers shot and killed his brother at an SCNC demonstration. With the help of family friends, B.C. managed to escape the country, and he entered the United States in January 2018.

## C. Initial Interactions with Immigration Officials

Upon entry, officers of the United States Customs and Border Protection ("Customs") interviewed B.C. and seized his documents. Among those documents was a card listing him as a member of the SCNC. As a result of the interview, Customs determined he was subject to removal and placed him in detention. No interpreter was provided during this interview, and, as B.C. reported, he therefore "did [his] best with [his] limited ['Standard'] English." A.R. at 123. When he expressed a fear of returning to Cameroon, the Customs officer referred him for a credible fear interview, which is a threshold proceeding conducted by an asylum officer from the United States Citizenship and Immigration Services ("USCIS") to determine whether a case should be referred to an IJ for a full hearing.

About three weeks later, B.C. attended his credible fear interview. Again, no interpreter was provided. B.C. reports that, "[a]lthough [he] did not always understand everything [he] was asked," he "did [his] best to use . . . [']Standard['] English" during the interview. *Id.* The asylum officer determined B.C. had established the requisite credible fear and referred his case to an IJ. Throughout this period and in preparation for his appearance before the IJ, B.C. asked the Government to return his SCNC membership card numerous times, but the Government failed to do so and he was unable to get the card back for more than a year.

## D. Appearances before the IJ

B.C. subsequently made multiple appearances before the IJ. Because the IJ's approach to the language issue varied

9

by hearing, we describe the events of each hearing in detail. Notably, over the course of these proceedings, B.C. (who was appearing *pro se*) was not once asked to identify in his own words the languages he speaks or offered a "Pidgin" English interpreter.

### 1. First Appearance

B.C. first appeared before the IJ in March 2018. The scene was passing strange: Due to a "scrivener's error," B.C.'s Notice to Appear erroneously stated that he was a citizen of Guatemala. A.R. at 438. He therefore found himself at a preliminary group hearing with noncitizens who primarily spoke Spanish and where the only available interpreter was a Spanish speaker. When the IJ turned to B.C., he did not ask what languages B.C. spoke, but instead gave him a simple choice between two languages: "Spanish or English?" A.R. at 460. Having no other option, B.C. chose English. *Id.* In "Standard" English and with a Spanish interpreter, the IJ then explained the removal process to the group.

### 2. Second Appearance

A few days later, B.C. appeared before the IJ again for an individual hearing. The IJ opened the hearing by introducing a Spanish interpreter without asking whether B.C. spoke that language. Because B.C. is not a Spanish speaker, he interjected with one word: "English." *Id.* The IJ did not inquire about what type of English B.C. spoke, instead asking him preliminary questions in "Standard" English and clarifying that he was not in fact a citizen of Guatemala. In the middle of the proceeding, the IJ asked B.C., "Do you need a French interpreter or are you okay with the English?" A.R. at 480.

10

B.C. responded that he was "okay in English." *Id.* The IJ later asked if B.C. "read and underst[ood] French and English," to which B.C. responded, "I read and understand English and French, a little bit." A.R. at 484–85.

In response to the IJ's substantive questions, B.C. admitted that he entered the United States without the appropriate documentation. The IJ therefore sustained the removability charge. B.C. then filed applications for asylum, withholding of removal, and protection under the CAT, which he later supplemented with various supporting documents, including his brother's Cameroonian death certificate, evidence of country conditions in Cameroon, and statements from friends corroborating the circumstances of his brother's death.

### 3. Merits Hearing

For months after these preliminary hearings, B.C. remained in detention and attempted to improve his "Standard" English. In July 2018, the IJ convened a merits hearing. B.C. again appeared *pro se*. The IJ asked him a series of questions without first inquiring whether he needed an interpreter and instead asking only whether he was an "English speaker" or an "Anglophone." A.R. at 526, 531, 543. The hearing transcript suggests there was a language barrier between B.C. and the IJ. For example, at least 36 separate times the transcript records B.C.'s testimony as "indiscernible," meaning the court reporter was unable to decipher what he was saying. And the IJ frequently interrupted B.C. to criticize him for sounding "memorized" and "stilted." *See* AR at 539–41, 549, 554–55, 588.

11

After the questioning concluded, the IJ and B.C. had a lengthy discussion demonstrating the IJ's failure to appreciate the distinction between "Standard" and "Pidgin" English. We reproduce portions of the conversation below to illustrate the depth of the misunderstanding between the two:

> [Judge:] When we first started off, I have to tell you something, you were running like a train out of the station. Almost like you memorized something and I couldn't . . . understand what was going on because it was very stilted. And I'm trying to be as understanding as possible but there are some inconsistencies from what the Asylum Officer said . . . .
>
> [B.C.:] Your Honor, maybe it was the language because --
>
> [Judge:] You speak English. I speak English.
>
> [B.C.:] Yes, my English wasn't fluent [during the interview with the asylum officer]. I speak, it wasn't really coming out. But now I practice a lot . . . .
>
> [Judge:] . . . . [W]hy would you have to practice English if your mom and your family spoke English at home?
>
> [B.C.:] I started English just in primary school. Going to secondary school, we have just French.
>
> [Judge:] But what did your parents speak?
>
> [B.C.:] Huh.
>
> [Judge:] What did your mom and dad speak?
>
> [B.C.:] They speak our local language.
>
> [Judge:] What is it?
>
> [B.C.:] That's Pidgin.
>
> [Judge:] Pidgin English.
>
> [B.C.:] Pidgin English, yes.

[Judge:] Well, I know Pidgin English[5] . . . . Why did you have to practice English?

[B.C.:] Huh?

[Judge:] Why would you have to practice English if that's your native language?

[B.C.:] Your Honor, when I went to secondary school . . . .

[Judge:] . . . . But when did you start secondary school? How old were you?

[B.C.:] . . . . I was already 13 years old.

[Judge:] Right. So you had spent 13 years of your life speaking English, right?

[B.C.:] Yes.

[Judge:] So you wouldn't need to relearn it at your age . . . .

[B.C.:] I go to school and come back home, it's just Pidgin only used in the house.

[Judge:] I don't know about that. I don't know if you need to learn English.

A.R. at 588–91.

---

[5] Although the IJ asserted that he "kn[ew] [']Pidgin[']" English," the record belies this contention. There is no indication from the transcript that the IJ made an effort to speak to B.C. in any language other than "Standard" English. The IJ's suggestion that he spoke "Pidgin" English therefore seems to underscore the extent of his misunderstanding about what "Pidgin" English is.

### 4. The IJ's Decision

The IJ subsequently denied all relief and ordered B.C removed. His decision rested solely on the conclusion that B.C. did not testify credibly and thus the IJ did not reach the merits of B.C.'s claims. The IJ was primarily concerned with "inconsistencies" between B.C.'s representations to the asylum officer and testimony at the merits hearing, and with his demeanor at the merits hearing. Again failing to acknowledge the distinction between "Standard" and "Pidgin" English, the IJ found B.C.'s "explanations regarding any language issues with the asylum officer inadequate and unconvincing, given his claim that he is an English speaker and the questions were simple and asked multiple times." A.R. at 446. Finally, although the IJ had previously acknowledged that members of the SCNC and SDF may face persecution in Cameroon, he suggested it was troubling that B.C. "did not submit evidence of his membership" in either organization. A.R. at 444. Notably, the IJ did not mention that the reason B.C. lacked this evidence was because the Government had confiscated his SCNC membership card and failed to give it back in time for the hearing. Nor did the IJ substantively discuss or credit any of the other documents that B.C. provided in support of his application.

### 5. Proceedings before the BIA

B.C. appealed to the BIA, arguing that the IJ violated his right to due process by neglecting to ascertain the languages he speaks proficiently or provide an interpreter, made an unsupported adverse credibility determination, and failed to consider his documentary evidence. The BIA dismissed the appeal because it was "unpersuaded . . . that [B.C.'s] English

14

was limited enough to trigger" the need for language assistance. A.R. at 342. The BIA also concluded the IJ's adverse credibility finding was not clearly erroneous because it was supported by numerous inconsistencies in the record. *Id.* Although the IJ failed to discuss specifically the documentary evidence supporting B.C.'s application, the BIA decided this was not an error because the IJ made a blanket statement that "all evidence not mentioned was fully considered." A.R. at 343.

After the BIA's decision, and with the assistance of counsel, B.C. was finally able to get his SCNC membership card back from the Government. Based in part on this evidence, B.C. moved for reconsideration and reopening of his case, which the BIA denied. B.C. petitioned us for review of the BIA's initial decision and its denial of the motion for reconsideration. We consolidated the petitions and granted a stay of removal.

## II. Jurisdiction and Standard of Review

The BIA's jurisdiction arose under 8 C.F.R. §§ 1003.1(b)(3) and 1003.2. We have jurisdiction under 8 U.S.C. § 1252 to review the BIA's decision, and we review the IJ's decision to the extent the BIA "substantially relied on that opinion." *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009), *as amended* (Nov. 4, 2009). We review legal questions anew, *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 213 (3d Cir. 2017), factual determinations and findings of credibility for substantial evidence, *Abulashvili v. Att'y Gen.*, 663 F.3d 197, 202 (3d Cir. 2011), and the denial of a motion to reconsider or reopen for abuse of discretion, *Serrano-Alberto*, 859 F.3d at 213.

15

### III. Discussion

The BIA did not evaluate, and we have no occasion to review, the merits of B.C.'s claims for asylum, withholding of removal, and relief under the CAT. Instead, we are primarily asked to determine whether the proceedings were "conducted in a fair enough fashion for one to determine that the BIA's decision was based on reasonable, substantial, and probative evidence." *Cham v. Att'y Gen.*, 445 F.3d 683, 693 (3d Cir. 2006) (citation omitted). We conclude they were not.

#### A. Due Process

The Fifth Amendment's Due Process Clause applies to noncitizens in the United States. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). "[A]s a matter of due process," B.C. deserves "a full and fair hearing on his application[s]" for asylum, withholding of removal, and relief under the CAT. *Cham*, 445 F.3d at 691. There are three pillars of a fair hearing: (1) the IJ engages in fact-finding based on the record made at a hearing and disclosed to the noncitizen; (2) the noncitizen has the opportunity to make arguments and present evidence on his/her own behalf; and (3) the IJ makes an individualized determination of the noncitizen's claims. *Chong v. Dist. Dir., I.N.S.*, 264 F.3d 378, 386 (3d Cir. 2001).

For two reasons, we hold the second pillar was not satisfied here. First, at the beginning of the removal process, the IJ did not take adequate steps to evaluate whether B.C. needed an interpreter. And second, as the merits hearing proceeded, the IJ failed to identify that an interpreter might be needed, even though there was ample evidence that B.C. might not be sufficiently proficient in "Standard" English. This had

16

the potential to, and likely did, affect the outcome of the proceeding. We therefore remand for the IJ to conduct a new hearing.

### 1. Failure to conduct an adequate threshold inquiry into the need for an interpreter

It is well established that the provision of an interpreter is a "minimum" requirement of a fair hearing for asylum applicants who have limited English proficiency; otherwise, an applicant's "procedural rights would be meaningless in cases where the judge and . . . applicant cannot understand each other." *Marincas v. Lewis*, 92 F.3d 195, 204 (3d Cir. 1996)[6]; *see also, e.g.*, *Perez-Lastor v. I.N.S.*, 208 F.3d 773, 778 (9th Cir. 2000) ("It is long-settled that a competent translation is fundamental to a full and fair hearing. If a[] [noncitizen] does not speak English, deportation proceedings must be translated into a language the [noncitizen] understands."); *Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir. 1984) ("A hearing is of no value when the [noncitizen] and the judge are not understood. . . . The very essence of due process is a 'meaningful opportunity to be heard.'") (citation omitted); *Matter of Tomas*, 19 I. & N. Dec. 464, 465 (BIA 1987) ("The presence of a competent

---

[6] *Marincas* involved the requirements for a fair hearing under the Refugee Act of 1980, Pub. L. No. 96-212 (1980), not the Due Process Clause of the Fifth Amendment. However, we made clear that those requirements are overlapping, because "fairness mandate[s] that the asylum procedure promulgated by the Attorney General [under the Refugee Act] provide the most basic of due process." 92 F.3d at 203. And "the most basic of due process," in turn, requires the provision of an interpreter to a noncitizen who has limited English proficiency.

interpreter is important to the fundamental fairness of a hearing, if the [noncitizen] cannot speak English fluently.").

The Government does not dispute this requirement. *See* Gov. Br. at 48–49 n.6 ("There is . . . no dispute that, of course, the agency has a duty to provide translation services in the absence of standard English proficiency."); Oral Arg. Tr. at 43:10–15 (Q: "I take it the government doesn't dispute the notion that those who [have limited English proficiency], that due process requires that those types of aliens be provided an interpreter." A: "Do not dispute that. Due process does require someone [who has limited English proficiency] to have an interpreter."). Nor does the Government dispute that as a practical matter, before an interpreter can be provided, there must "be some determination at the outset of a hearing whether an interpreter is required or not." Oral Arg. Tr. at 44:11–13. Instead, the parties disagree about what that determination must include to satisfy due process. The Government argues that the procedures the IJ followed here—which included giving B.C. a binary choice between two languages and asking him if he was an "English speaker"—are sufficient. B.C. contends that due process requires a more robust inquiry. For the reasons discussed below, we agree with B.C. and hold that due process requires IJs to determine whether a noncitizen has a sufficient level of proficiency in "Standard" English to proceed without an interpreter. This may begin by giving noncitizens a meaningful chance to express, on their own terms at the outset of a hearing, the languages in which they are sufficiently proficient.

In analyzing due process claims, we turn to the three factors described decades ago in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): (1) the interest at stake for the individual

18

noncitizen; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* All three factors support B.C.'s claim that he was denied due process.

The interests at stake for B.C. were considerable. "Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. . . . Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness."[7] *Bridges v. Wixon*, 326 U.S. 135, 154 (1945).

With respect to the second factor, there is an unacceptably high risk of erroneously depriving a noncitizen

---

[7] In the analogous criminal context, several of our sister circuits have held that judges have an affirmative duty to evaluate the need for an interpreter for an individual who has limited English proficiency. *See, e.g.*, *Ramos-Martínez v. United States*, 638 F.3d 315, 325 (1st Cir. 2011) ("Once the court is on notice that a defendant's understanding of the proceedings may be inhibited by his limited proficiency in English, it has a duty to inquire whether he needs an interpreter."); *United States v. Edouard*, 485 F.3d 1324, 1337 (11th Cir. 2007) ("[T]he [Court Interpreters] Act places on the trial court a mandatory duty to inquire as to the need for an interpreter when a defendant has difficulty with English.") (internal quotation marks and citation omitted) (emphasis omitted).

19

of his liberty when an IJ does not properly assess whether he needs an interpreter. "Immigration law is a field in which fair, accurate factfinding is of critical importance." *Calderon-Rosas v. Att'y Gen.*, 957 F.3d 378, 381 (3d Cir. 2020). When a noncitizen and an IJ cannot fully understand each other due to a language barrier, there is a significant risk that an IJ will make inaccurate factual or credibility findings that may cause the noncitizen to be deported unfairly. *Cf. Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1562 (11th Cir. 1989) ("The ability of the adjudicator . . . to make a reasonable assessment of the applicant's credibility is obviously hampered by his inability to understand the applicant's statements.").

The IJ's approach to evaluating B.C.'s need for an interpreter enhanced the risk that he and B.C. would have difficulty understanding each other. As we have previously explained, giving a noncitizen an "either-or" choice between two languages, based on the unfounded assumption that he must be proficient in at least one, is not an accurate method of determining which language(s) the noncitizen speaks proficiently. *See Senathirajah v. I.N.S.*, 157 F.3d 210, 218 (3d Cir. 1998). Similarly, asking a noncitizen if he is an "English speaker" or an "Anglophone" is not a particularly helpful inquiry, as he might answer "yes" even if he understands "Standard" English only at a rudimentary level or speaks a variation of English that is not mutually intelligible to a "Standard" English speaker. Given the "various degrees of proficiency one may have with a foreign language," and the "difficulty someone from [another country] may have in understanding 'American English,' particularly under the stressful circumstances of entry into a new country," "[i]t seems no stretch . . . to assume that [a noncitizen] might . . .

20

need[] an interpreter even if he technically 'sp[eaks] the same language' as the" immigration official. *Id.* at 218 and n.10.

It is also ineffective to presume that, because a noncitizen is able to respond to certain basic questions in "Standard" English, and even submitted written materials in that language, he must necessarily be a fluent "Standard" English speaker who does not need an interpreter. A person who has limited "Standard" English proficiency "may be competent in certain types of ['Standard' English] communication . . . but still [have limited proficiency in 'Standard' English] for other purposes." A.R. at 272–73. With unlimited time and access to a bilingual dictionary, for example, a noncitizen who lacks proficiency in "Standard" English might be able to compose a reasonably coherent written statement in that language. But that same individual might have trouble responding orally to rapid-fire questions in "Standard" English during a high-pressure hearing.

There are other methods by which the IJ could have evaluated whether B.C.'s "Standard" English was deficient enough to warrant an interpreter. The IJ could have begun by asking which languages he spoke and understood best or in which languages he was comfortable proceeding. Alternatively, the IJ could have asked an interpreter or a multilingual staff member to verify the languages in which B.C. was proficient. The IJ could also have used a visual aid, like a card or poster showing the (translated) names of a variety of possible languages and asked B.C. to point to the relevant languages. If B.C. had been accompanied by a relative or friend who spoke English well, the IJ could have asked that person about his language needs. This list of possible approaches is non-exhaustive, and we do not prescribe any

21

script or checklist that must be followed in every case, nor do we suggest that any particular answer to these inquiries is dispositive of the need for an interpreter. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."). But these methods share a common theme: giving the noncitizen the opportunity to communicate his language proficiency on his own terms. And the IJ's approach here did not give B.C. that opportunity.

Additional safeguards would have significantly reduced the risk of erroneously depriving B.C. of his liberty. If the IJ had simply asked him at the outset what languages he felt comfortable proceeding in, he might have responded that he was proficient in "Pidgin" English but not "Standard" English. This inquiry may have led the IJ to secure the relevant interpreter, which could have eliminated the possibility that B.C.'s testimony, and the IJ's reaction to it, were colored by the language barrier.

On the third factor, we do not underestimate the Government's interest in the orderly administration of removal proceedings. But conducting a meaningful threshold assessment of the need for an interpreter would facilitate, not threaten, that interest. By engaging in a brief initial colloquy along the lines outlined above, the IJ in this case could have saved himself time and trouble. For example, he could have forgone the lengthy, confusing discussion with B.C. at the conclusion of the hearing about why the latter struggled to express himself in "Standard" English. *See* A.R. at 588–91.

Failing to provide an interpreter when needed makes meaningless a noncitizen's right to due process. And not

22

making a threshold inquiry into whether an interpreter is needed, in turn, renders the right to an interpreter meaningless. Because the IJ did not make the proper inquiry here, the proceeding did not comply with due process.

### 2. Failure to realize an interpreter was needed as the merits hearing continued

A noncitizen's due process rights do not end once his merits hearing has begun; rather, they continue "[t]hroughout all phases of [the] deportation proceeding[]." *Serrano-Alberto*, 859 F.3d at 213. An IJ therefore has an ongoing obligation to offer an interpreter if it becomes readily apparent during a merits hearing that a noncitizen is having trouble speaking or understanding "Standard" English. The *Mathews* factors discussed above apply with equal force in this context. The Government argues the IJ complied with this requirement because "B.C. and the [IJ] had no trouble understanding each other." Gov. Suppl. Br. at 6.

Substantial evidence does not support this conclusion. The hearing transcript reflects 36 separate instances in which B.C.'s testimony was "indiscernible." *See, e.g.*, A.R. at 563 ("[Government lawyer to B.C.]: Q. Sir, your mother is still alive. Is that right? Or is she deceased? A. My mother is still alive. Q. Okay. And how about your father? A. He's [indiscernible]. Q. I'm sorry. A. [Indiscernible]. [Judge to B.C.]: Q. He's what? A. [Indiscernible]."). On several occasions, B.C. initially gave non sequitur answers to questions that suggested he lacked a full understanding of what he was being asked. *See, e.g.*, A.R. at 544 ("Q. During that time period, did you go to the bathroom? A. During that time, took everything out of my pockets."); A.R. at 557 ("Q. How

23

did you get on the airplane? A. Cameroon. Q. How did you get on the airplane? A. I had [indiscernible].")."). He often responded to questions in fragments that make it difficult to ascertain what he was saying. *See, e.g.*, A.R. at 532 ("A. . . . . So there's been an Anglophone did not accept Anglophones in Cameroon because they said the only way . . . ."); A.R. at 545 ("Q. Was it just a coincidence that you were placed there? A. It's not a coincidence. All the people, all the military people who [indiscernible] Anglophone. We don't have Anglophone.").

These issues should have led the IJ to realize that, despite his assumptions to the contrary, B.C. might have limited "Standard" English proficiency. *See Abulashvili*, 663 F.3d at 206 ("[T]he IJ should have realized that [the noncitizen's] purported comprehension of English was not consistent with the difficulty he had in communicating, and that observation would have required neither familiarity with his language nor any particular expertise in communication theory."). Yet, instead of acknowledging the potential problem and seeking to remedy it, the IJ doubled down. When B.C. appeared to be having trouble expressing himself, the IJ did not ask whether he needed an interpreter, but instead attributed the issue to B.C.'s "accent" and instructed him to "go slowly." A.R. at 532. And when B.C. eventually pointed out that his first language was "Pidgin" English, the IJ failed to understand the distinction between that language and "Standard" English, asking B.C. no less than three times why he would need to "practice" English if he grew up speaking it. A.R. at 588–591. The IJ then asserted, with no apparent basis, that he himself "kn[ew] Pidgin English." A.R. at 589. Because he ignored repeated signs that an interpreter might be needed, including B.C.'s own explanation of the difference between "Standard"

24

and "Pidgin" English, we cannot conclude that the IJ's handling of the hearing comported with due process.

To be clear, a few limited instances of communication difficulties are not enough, standing alone, to violate the process one is due. Nor is the mere fact that a transcript contains certain "indiscernible" testimony sufficient on its own to establish a language barrier. It is the unusually large amount of "indiscernible" testimony, coupled with other readily apparent indicia of misunderstandings, that convince us there was a language barrier here.

### 3. Prejudice

In some cases, a due process issue may not warrant a remand to the agency where it is clear the noncitizen suffered no prejudice from the agency's errors. *See Cham*, 445 F.3d at 694 (noting that, to establish a due process violation, a noncitizen must show "that the violation of a procedural protection . . . had the *potential* for affecting the outcome of [the] deportation proceedings") (internal quotation marks and citation omitted) (emphasis and alteration in original). This is not such a case. The IJ's errors had the potential to affect the outcome of the proceedings in two ways. First, as discussed above, the failure to evaluate B.C.'s need for an interpreter resulted in confusion and misunderstanding during the merits hearing. And second, the IJ's failure to recognize the language barrier may well have impermissibly colored his ultimate adverse credibility determination.

The IJ found B.C. was not credible in part because he "appeared to have memorized his testimony," which "seemed stilted, robotic, and unnatural," and he became "flustered when

25

asked questions that caused him to deviate from his prepared statements." A.R. at 445. The IJ was also troubled by what he believed to be "inconsistencies" between B.C.'s statements at various points in the proceedings, even though those statements were made without the benefit of an interpreter.

"[T]he linguistic and cultural difficulties endemic in immigration hearings may frequently result in statements that appear to be inconsistent" or unnatural, "but in reality arise from a lack of proficiency in English or cultural differences rather than attempts to deceive." *Abulashvili*, 663 F.3d at 206. This is especially true when a *pro se* noncitizen with limited proficiency in "Standard" English is forced to proceed without an interpreter. It is easy to imagine that a person in that position might attempt to rehearse or memorize certain portions of his testimony to compensate for his lack of comfort speaking off-the-cuff in "Standard" English and might seem "flustered" if asked to speak extemporaneously. A noncitizen might appear especially uncomfortable where, as here, the IJ frequently interrupts him and admonishes that he sounds "bad" and "not . . . very natural." *See, e.g.*, A.R. at 541, 549, 550, 593. A language barrier might also cause a noncitizen to testify less precisely and consistently than he otherwise would. *Cf. Balasubramanrim v. I.N.S.*, 143 F.3d 157, 163–64 (3d Cir. 1998) (rejecting adverse credibility determination based on purported inconsistencies between statements made during an asylum interview and a merits hearing because the noncitizen did not have the benefit of an interpreter during the interview).

We sometimes remand immigration cases even absent a due process challenge when there are serious concerns that an unskilled interpreter has prejudiced a noncitizen. *See, e.g.*, *Issiaka v. Att'y Gen.*, 569 F.3d 135, 143 (3d Cir. 2009); *Kaita*

26

*v. Att'y Gen.*, 522 F.3d 288, 299–300 (3d Cir. 2008). But the violation here is even more pronounced: we cannot assess the effect that any interpreter's errors may have had on the outcome of the case because no interpreter was provided at any stage in the proceeding. And instead of reaching the merits of B.C.'s arguments, the IJ rejected his claims solely on credibility grounds, which are uniquely susceptible to being influenced by a language barrier.[8] Accordingly, we cannot avoid the conclusion that the IJ's decision was shaped in part by the language issue.[9] Hence we conclude a remand is appropriate and that B.C. "must be given a second, and a real, chance to create a record in a deportation hearing that comports

---

[8] B.C. represented during the hearing that he struggled to speak in "Standard" English during the asylum interview, but he tried to practice that language while in detention. Even if B.C.'s "Standard" English had improved enough by the merits hearing that an interpreter was unnecessary, a remand would still be appropriate because the IJ failed to appreciate that "Standard" and "Pidgin" English are different languages, and proficiency in one does not necessarily confer proficiency in the other. Due to this misunderstanding, the IJ relied on B.C.'s earlier testimony during the asylum interview as though it had been delivered by a native "Standard" English speaker when in fact it had not. This may have colored the adverse credibility determination.

[9] B.C. argues that, under our precedent in *Leslie v. Attorney General*, 611 F.3d 171, 180 (3d Cir. 2010), he is entitled to an automatic remand due to the agency's failure to comply with the Executive Office for Immigration Review's language access plan. Because B.C.'s petition succeeds on the ground outlined above, we need not reach this issue.

27

with the requirements of due process." *Cham*, 445 F.3d at 694 (internal quotation marks and citation omitted).[10]

## B. Other Errors

Because we conclude a remand for a new hearing is appropriate due to the language issue, we could stop there without further scrutinizing the IJ and BIA's decisions. However, we briefly note other aspects of their approach that we find troubling and should be addressed on remand.

### 1. Reliance on potentially unsupported "inconsistencies"

As noted above, we cannot fully evaluate the IJ's adverse credibility finding because it inextricably links to the language barrier. But even if there were no language issue, at least some of the purported "inconsistencies" in B.C.'s testimony seem to lack record support for other reasons. To be sure, "an adverse credibility determination can be based on inconsistencies, inaccuracies, and other factors, irrespective of

---

[10] B.C. also briefly asserts that the language issue violated his right to equal protection. Because his discussion of the issue is so cursory, it is most likely forfeited. *Cf. Laborers' Int'l Union of N. Am. v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court.") (internal quotation marks and citation omitted). But even if we can consider this argument, it is unpersuasive because B.C. does not claim any disparity in the availability of translators is due to discriminatory intent.

whether they go to the heart of an applicant's claim," *Abulashvili*, 663 F.3d at 202 n.7 (citing 8 U.S.C. § 1158(b)(1)(B)(iii)), and our review of that determination is deferential, *id.* at 205. But this standard does not "permit a judge to cherry pick facts or inconsistencies to support an adverse credibility finding that is unsupported by the record as a whole." *Ilunga v. Holder*, 777 F.3d 199, 207 (4th Cir. 2015) (internal quotation marks omitted).

Several of the cited "inconsistent" statements may not in fact be inconsistent. For example, the IJ faulted B.C. for giving the asylum officer at the credible fear interview one reason why he believed the government in Cameroon wanted to harm him but then giving another reason at his merits hearing. In drawing this conclusion, the IJ treated the asylum officer's typo-ridden notes as a complete and fully accurate representation of the credible fear interview, even though those notes state they "are not a verbatim transcript of this interview" and may exclude certain "areas of the individual's claim." A.R. at 833. Even if the asylum officer's notes accurately captured the nuance of B.C.'s answers, that B.C. gave a partial explanation of his experiences before the asylum officer, and then supplemented that explanation during the merits hearing, is not necessarily a sign of inconsistency. Instead, it could reflect the different contexts of the credible fear interview and merits hearing: one is a brief, threshold undertaking, and the other is a lengthy proceeding in which a noncitizen is asked to respond to a series of highly specific questions. On remand, the IJ should account for the context in which B.C. testified before jumping to the conclusion that his testimony was "inconsistent."

## 2. Ignoring corroborative evidence

The IJ did not address documentary evidence that might have corroborated some of B.C.'s claims. Specifically, B.C. submitted his brother's Cameroonian death certificate, two letters from friends describing his brother's death, and background information on country conditions in Cameroon. Although the IJ had previously acknowledged that the circumstances surrounding B.C.'s brother's death were highly relevant to his claim, *see* A.R. at 499 ("[T]his [case] is likely going to rise or fall on credibility . . . [a]nd the death certificate."), he inexplicably failed to discuss the substance of the death certificate at all in his opinion. He similarly neglected to discuss the evidence of country conditions or letters corroborating the story of B.C.'s brother's death beyond criticizing the letters for failing to include specific details about B.C.'s own activism in Cameroon. The BIA was untroubled by these exclusions, stating in conclusory fashion that "all evidence not mentioned [by the IJ] was fully considered" and that, in any event, "the death certificate is insufficient to overcome . . . [the] adverse credibility finding." A.R. at 343.

"Although the BIA does not need to discuss every piece of evidence in the record, it may not ignore or misconstrue evidence in the asylum applicant's favor." *Tilija v. Att'y Gen.*, 930 F.3d 165, 172 (3d Cir. 2019) (internal quotation marks and citation omitted). The death certificate could have corroborated B.C.'s testimony about the circumstances of his brother's death, which the IJ conceded was important. Even if the IJ and BIA found that document unpersuasive, they should at least have explained their reasoning. And if the IJ intended to fault B.C. for failing to obtain letters corroborating his political activism in Cameroon, he should have given B.C.

30

"notice [and] an opportunity to provide [that] evidence or explain its unavailability." *Saravia v. Att'y Gen.*, 905 F.3d 729, 738 (3d Cir. 2018).

### 3. Faulting B.C. for not presenting a document withheld by the Government

Finally, the IJ criticized B.C. for failing to "submit evidence of his membership" in two Cameroonian organizations—the SCNC and SDF. A.R. at 444. But the IJ never acknowledged that the reason B.C. lacked an SCNC membership card was because the Government confiscated it when he entered the United States and, despite multiple requests, did not return it until after his merits hearing had concluded. To date, the Government has not provided an explanation for why the card was withheld. Oral Arg. Tr. at 45:18–20 (Government counsel: "I do not [know] why it took so long for them to produce the document . . .[,] just simply, it takes a while."). And the card was highly relevant to B.C.'s claims. The IJ repeatedly acknowledged that members of the SCNC are persecuted in Cameroon and that a "true SCNC supporter[]" would be entitled to relief. A.R. at 499, 595. He doubted, however, that B.C. was a "true SCNC supporter[]." *Id.* at 595. The card could have bolstered B.C.'s credibility on that issue. On remand, the IJ should consider the card along with the other relevant evidence put in the record.[11]

---

[11] B.C. argues the BIA erred in denying his motion for reopening or reconsideration based in part on the submission of his SCNC membership card. Because we remand to the IJ for a new hearing as outlined above, we need not separately reach this issue. We note, however, that given the introduction

31

\*　\*　\*　\*　\*

Due process requires that an interpreter be provided during removal proceedings to noncitizens who have limited proficiency in English. Implicit in that requirement is a preliminary step: an IJ must meaningfully evaluate whether an interpreter is needed. And because the right to an interpreter extends throughout the entire proceeding, an IJ has a continuing obligation to offer an interpreter if it appears a noncitizen is having significant trouble speaking or understanding "Standard" English. The failure to take these steps, or to appreciate that a noncitizen has limited proficiency in "Standard" English, can impermissibly affect an IJ's adverse credibility determination. Because the IJ failed to satisfy these requirements in this case, which prejudiced B.C., we vacate the BIA's decisions and remand for a new hearing.

---

through the motion of the expert reports regarding "Pidgin" English and its speakers, coupled with B.C.'s own linguistic difficulties, it is surprising the BIA failed to recognize the extent to which "Standard" and "Pidgin" English differ.